**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 9, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

No. 09-6176

JOHN E. KITCHELL,

     Defendant-Appellant.

--------------------------------------

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

No. 09-6206

EDWARD KATSUAKI SHIGEMURA,

     Defendant-Appellant.

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:09-CR-00091-C)**

William H. Campbell, Oklahoma City, Oklahoma, for Defendant-Appellant John E. Kitchell.

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant Edward Katsuaki Shigemura.

Chris M. Stephens, Assistant United States Attorney (Sanford C. Coats, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **GORSUCH** and **EBEL**, Circuit Judges, and **ARGUELLO,** District Judge.[1]

---

**EBEL**, Circuit Judge.

---

Defendants-Appellants Edward Katsuaki Shigemura and John Kitchell were arrested and charged with possessing firearms following a prior felony conviction after highway patrol officers stopped and searched their rental vehicle and found six firearms in the trunk. The district court denied the appellants' joint motion to suppress evidence seized during the stop, and they were convicted after a jury trial. In sentencing Mr. Shigemura, the court applied a sentencing enhancement under U.S.S.G. § 2K2.1(b)(6) for possession of a firearm in connection with another felony offense.

On appeal, Mr. Shigemura challenges the district court's denial of the motion to suppress on a number of grounds. He also challenges the district court's application of the sentencing enhancement. Mr. Kitchell too challenges the denial of the motion to suppress, and further contends that the government did not present sufficient evidence to

---

[1] The Honorable Christine M. Arguello, United States District Judge for the District of Colorado, sitting by designation.

support the jury's verdict.  Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I.    BACKGROUND

### A.    Factual Background

On February 24, 2009, Oklahoma Highway Patrol ("OHP") Trooper Cody Hyde was parked on Interstate 44 near the turnpike toll plaza in Stroud, Oklahoma.  As part of Trooper Hyde's work with the Special Operations Division, he and other troopers were conducting "special emphasis" in the area, intended to enforce general Oklahoma traffic, public health, and criminal statutes.  At some point between 11 p.m. and midnight, Trooper Hyde believed he saw a red passenger car fail to activate its turn signal as it exited the two main lanes of the turnpike in order to enter into the cash lanes of the toll plaza.  Trooper Hyde believed that the driver of the car, Mr. Shigemura, again failed to use a turn signal as he crossed over at least two more lanes approaching the toll plaza.  Mr. Shigemura needed to cross these toll plaza lanes because each of the four cash toll booths was closed except for the last one on the very right side of the roadway.

Based on Trooper Hyde's belief that Mr. Shigemura had violated Oklahoma traffic laws by making an "unsafe lane change," Trooper Hyde pulled over the vehicle after it exited the toll plaza.  (United States v. Shigemura, Record on Appeal ("SROA"), vol. iii, pt. i at 22:21-24.)  Once Trooper Hyde activated his emergency lights, a dashboard

3

camera on his patrol car activated and recorded the subsequent traffic stop, including both the exterior and interior of the car.

### 1. Trooper Hyde's Initial Interaction with Mr. Shigemura (Supp. SROA, vol. iii ("Video") at 0:27-1:39.)[2]

After Trooper Hyde pulled over the vehicle, he approached the passenger side. Mr. Kitchell was in the back seat of the car, and a third occupant, John Sprous, was in the front passenger seat. Trooper Hyde asked Mr. Shigemura for his driver's license and proof of insurance. Mr. Shigemura told Trooper Hyde that the car was a rental, so Hyde asked for a copy of the rental agreement. Mr. Shigemura produced his driver's license and a copy of the rental agreement. Trooper Hyde explained why he had stopped the car, and asked Mr. Shigemura to come back to the patrol car so that Hyde could issue Mr. Shigemura a warning.

### 2. Trooper Hyde's First Interaction with Mr. Shigemura in the Patrol Car (Video at 1:40-7:24.)

Once inside the patrol car, Trooper Hyde explained that he pulled Mr. Shigemura over because Mr. Shigemura did not use his signal when he pulled in to pay the toll and when he crossed over additional lanes to reach the open toll booth. Mr. Shigemura replied, "You're right. I didn't do it." Trooper Hyde then explained that he was going to write Mr. Shigemura a warning, and that there would be no fine.

---

[2] The approximate duration of each interaction of the detention is provided for the purposes of assessing Mr. Shigemura's contention that the duration and scope of the detention was unreasonable under the Fourth Amendment. See infra Part II.A.3.

As he was writing the warning notice, Trooper Hyde asked Mr. Shigemura where Mr. Shigemura was headed.  Mr. Shigemura replied, "Oklahoma City."  When Trooper Hyde asked what was in Oklahoma City, Mr. Shigemura responded, "Some friends, that's all."  Trooper Hyde then asked more specifically, "Who are you going to see down there?"  After a pause, Mr. Shigemura replied, "Well . . . they live in Oklahoma City."  Trooper Hyde followed up by asking, "Who is it?"  At that point, Mr. Shigemura stated, "Just an old friend of mine, old girlfriend."  When Trooper Hyde asked if Mr. Shigemura was going to stay with his friend, Mr. Shigemura replied that he was, and when Hyde followed up by asking what his two passengers were going to do (i.e., where they were going to stay), Mr. Shigemura replied, "I don't know.  They're just riding."

Trooper Hyde then asked who was riding with Mr. Shigemura, and Mr. Shigemura identified Mr. Kitchell and Mr. Sprous by name.  Later, Mr. Shigemura volunteered that Mr. Sprous used to live in Oklahoma City and that Mr. Sprous was coming out to look for work there.  Trooper Hyde then examined the car rental agreement and noticed that the vehicle was leased to Mr. Kitchell, and that Mr. Shigemura was not listed as an authorized driver.  Mr. Shigemura assured Trooper Hyde that both he and Mr. Kitchell had adequate insurance.  Trooper Hyde and Mr. Shigemura next discussed this issue for approximately two and a half minutes.

5

### 3. Trooper Hyde's First Interaction with Mr. Kitchell and Mr. Sprous (Video at 7:30-10:02.)

Trooper Hyde next approached the rental car and spoke with Mr. Kitchell and Mr. Sprous through the driver's side door. He requested their driver's licenses, which they produced. He asked about their travel plans, and testified that Mr. Kitchell told him that they were travelling to Texas to visit Mr. Shigemura's family, although Mr. Kitchell did not know where Mr. Shigemura's family lived. Trooper Hyde testified that Mr. Sprous told him that he (Mr. Sprous) did not know where the three of them were going, and that he was just along for the ride and might go to some casinos.

### 4. Trooper Hyde's Second Interaction with Mr. Shigemura (Video at 10:34-20:38.)

After Trooper Hyde returned to the patrol car, he requested from "dispatch" criminal history checks and warrant checks on Mr. Shigemura, Mr. Kitchell, and Mr. Sprous. Still filling out the warning ticket, Trooper Hyde next asked Mr. Shigemura for his home phone number. Mr. Shigemura responded by pulling his cell phone out of his pocket, saying, "I've got to look it up." Trooper Hyde again asked Mr. Shigemura what Mr. Kitchell and Mr. Sprous planned to do in Oklahoma City, and Mr. Shigemura replied that Mr. Sprous used to work with his uncle "out there" years ago, and that Mr. Sprous was now looking for work. Trooper Hyde asked if Mr. Shigemura had ever faced any weapons, guns or drug charges, to which Mr. Shigemura replied that he had not.

Shortly thereafter, Trooper Hyde asked if they were going anywhere other than Oklahoma City, and Mr. Shigemura said that they were not. Trooper Hyde asked why

6

Mr. Kitchell had rented the car, and after a pause, Mr. Shigemura stated that Mr. Kitchell had "a deal" from a company, although Mr. Shigemura could not name the company. At that point, dispatch informed Trooper Hyde that the three individuals were clear on the warrant check.

### 5. Trooper Hyde's Second Interaction with Mr. Kitchell and Mr. Sprous (Video at 20:43-21:00.)

Trooper Hyde then went back to the rental car, returned Mr. Kitchell's and Mr. Sprous's driver's licenses, and questioned Mr. Sprous about his travel plans in light of what Mr. Shigemura had told Hyde in the patrol car. Trooper Hyde testified that Mr. Sprous told him that Mr. Sprous did not have any relatives in Oklahoma City, and he and Mr. Kitchell were not going anywhere other than Texas.

### 6. Trooper Hyde's Completion and Provision of the Warning Notice to Mr. Shigemura (Video at 21:11-21:55)

Back in the patrol car, Trooper Hyde asked Mr. Shigemura to sign the warning notice, and Mr. Shigemura complied. Trooper Hyde then returned Mr. Shigemura's license and gave him a copy of the warning notice. Trooper Hyde then asked if Mr. Shigemura had any questions, and when Mr. Shigemura said that he did not, Trooper Hyde said, "You all be careful."

### 7. Trooper Hyde's Final Conversation with Mr. Shigemura (Video at 21:56-22:56.)

As Mr. Shigemura was stepping out of the car, however, Trooper Hyde asked him if he could ask him a couple questions, and Mr. Shigemura agreed. Trooper Hyde asked

if Mr. Shigemura was carrying weapons, drugs, large amounts of currency, or anything illegal in the car, to which Mr. Shigemura said, "No," and, "We're not into that." Trooper Hyde then asked if he could search the car, to which Mr. Shigemura responded, "It's not my car. No. You're harassing us, I think." Trooper Hyde denied trying to harass them, but asked Mr. Shigemura to close the door of the patrol car. Trooper Hyde then told Mr. Shigemura that he would ask Mr. Kitchell for permission to search the car.

### 8. Canine Sniff of the Rental Car (Video at 22:57-27:45.)

Trooper Hyde then returned to the rental car and asked Mr. Kitchell for permission to search the car. Mr. Kitchell refused to give permission for a search. Trooper Hyde then asked if he could walk his narcotics dog around the car to conduct a free-air sniff of the exterior. Mr. Kitchell again refused to give permission. Trooper Hyde told him that he was going to conduct the canine sniff anyway.

Trooper Hyde then brought his narcotics dog, Meco, out of his kennel in the back seat of the patrol car, and walked Meco around the rental car twice—the first as a "quick," "free scan," and the second as a "detailed" scan. On the second pass, Meco "indicated" the scent of narcotics[3] by scratching at the seams of the driver's side and passenger's side doors, and on the trunk seam.

---

[3] Meco was certified to detect four odors: marijuana, cocaine, methamphetamine, and heroin.

8

9. **Search of the Rental Car and Arrests of Mr. Shigemura and Mr. Kitchell (Video at 27:46-41:10.)**

Trooper Hyde then returned Meco to the kennel in the patrol car, and asked Mr. Kitchell and Mr. Sprous to step out of the rental car. He searched both of them for weapons and found none on their persons; however, he did find a large amount of currency in Mr. Kitchell's pocket, later determined to total $17,504.36. By then, two other OHP Troopers had arrived on the scene, and one searched Mr. Shigemura for weapons. This search again was negative. The troopers then placed Mr. Shigemura and Mr. Kitchell in the front and back seats, respectively, of Trooper Hyde's patrol car, and placed Mr. Sprous in another patrol car.

The troopers then began a search of the rental car. In the trunk, they found a backpack containing a loaded revolver and cash totaling $41,983, a portion of which was arranged into fourteen separate bundles, each with a $100 dollar bill on top and $1 bills underneath. The search also ultimately uncovered five additional firearms,[4] duct tape, leather gloves, latex gloves, pocket knives, flex cuffs, a police scanner, a hat with the words "'FBI" on it, another hat with the word "NARC" on it, and a map of the Dallas/Fort Worth area, with the DFW airport circled in black ink.

---

[4] The guns found in the car include (1) a Browning Model 9mm; (2) a H&R Model #686 .22 caliber revolver; (3) a Rossi Model .38 special; (4) a Highpoint Model #995 Rifle, 9 mm; (5) a Davis Model # P380, .380 caliber; and (6) a Smith & Wesson Model #36, .38 caliber.

During the search, the video camera in Trooper Hyde's patrol car recorded several conversations between Mr. Shigemura and Mr. Kitchell. At one point, upon seeing one of the troopers bring something out of the interior of the car, Mr. Shigemura said, "They found that f****** gun," while Mr. Kitchell stated, "They went through the trunk." Once the troopers opened the trunk from the outside, Mr. Shigemura stated, "Oh f***, we're f*****. We're going to be here, you know that?" Shortly thereafter, Trooper Hyde returned to the patrol car, asked Mr. Kitchell and Mr. Shigemura to step out, and handcuffed them.

Once Mr. Shigemura and Mr. Kitchell were placed back in the patrol car and the search resumed, Mr. Shigemura told Mr. Kitchell that the troopers were looking at "all that other sh** in the trunk. John's sh**. Now they're looking at that bag. You know what's in that bag—bullsh**, gloves and sh**. You know what I mean?" Mr. Kitchell responded, "Mmm, they know what time it is." Mr. Shigemura responded, "Yeah, they know what time it is." After some additional conversation, Mr. Shigemura then said to Mr. Kitchell, "They ain't got to yours yet, you know what I mean?"

Later, the following conversation took place as Mr. Shigemura and Mr. Kitchell watched the officers search the trunk:

| | |
|---|---|
| **Mr. Shigemura**: | We've got some weapons charges, you dig what I'm saying? |
| **Mr. Kitchell**: | You ain't lying. |
| **Mr. Shigemura**: | Where was that other f****** nine? |
| **Mr. Kitchell**: | In the trunk. |
| **Mr. Shigemura**: | I know, where at? |
| **Mr. Kitchell**: | In the bag. |

10

| | |
|---|---|
| **Mr. Shigemura**: | It was in the bag? |
| **Mr. Kitchell**: | Yeah, they're going to get it out now. |
| **Mr. Shigemura**: | Hmm? |
| **Mr. Kitchell**: | They're getting it now. |
| **Mr. Shigemura**: | What? The bag? |
| **Mr. Kitchell**: | Yeah, they got the bag on top [of the car], I think. Or that's your bag. |
| **Mr. Shigemura**: | That's my bag. |

. . . .

| | |
|---|---|
| **Mr. Shigemura**: | Uh oh, more sh\*\*. John. |
| **Mr. Kitchell**: | My bag? |
| **Mr. Shigemura**: | Yup. |

Still later, Mr. Kitchell asked Mr. Shigemura, "Oh, they're getting down to the pistols now?" Mr. Shigemura responded, "Mmm hmm." Mr. Shigemura then stated to Mr. Kitchell, "Well, you know it could have been worse. They could have busted us on the way back. You know what I'm saying?"

After the search, Mr. Shigemura, Mr. Kitchell, and Mr. Sprous were transported to a nearby OHP warehouse in Stroud, where Trooper Hyde placed the backpack containing the $41,983 in a large bay area. Trooper Hyde had Meco do a scan of the warehouse, and Meco alerted and indicated to the backpack. Later tests by OHP using an "ion scan" indicated detectable amounts of cocaine and methamphetamine on the currency in the backpack, although no other drugs were found in the rental car. The $17,504 found on Mr. Kitchell did not test positive for drug residue.

**B.      Procedural Background**

On March 18, 2009, Mr. Shigemura, Mr. Kitchell, and Mr. Sprous were each indicted on one count of possessing firearms in or affecting interstate commerce

11

subsequent to a prior felony conviction, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2. On April 23, 2009, the defendants filed a joint motion to suppress the evidence seized during the traffic stop, contending, <u>inter alia</u>, that (1) the stop was not supported by reasonable suspicion of a traffic violation; (2) the detention of the defendants during the stop was unlawfully excessive; and (3) Trooper Hyde did not have probable cause to search the vehicle.

After a hearing on May 20, 2009, which included testimony by Trooper Hyde regarding the stop and search of the vehicle, the district court denied the motion to suppress. On May 27, 2009, Mr. Shigemura and Mr. Kitchell were found guilty after a one-day jury trial.[5] On August 26, 2009, Mr. Kitchell was sentenced to 188 months in prison, and on September 23, 2009, Mr. Shigemura was sentenced to 78 months in prison. Mr. Kitchell and Mr. Shigemura each filed a timely notice of appeal.

## II.    DISCUSSION

In this appeal, Mr. Shigemura contends that the district court erred in two ways—first, by denying the motion to suppress, and second, by applying the sentencing enhancement under U.S.S.G. § 2K2.1(b)(6). Mr. Kitchell also argues that the district court erred by denying the motion to suppress, and further argues that the government did

---

[5] Mr. Sprous pled guilty instead of proceeding to trial, and on August 26, 2009, was sentenced to 180 months' imprisonment. <u>See</u> <u>United States v. Sprous</u>, 389 F. App'x 826, 826 (10th Cir. July 29, 2010) (unpublished).

not provide sufficient evidence for a reasonable jury to find that he possessed a firearm for the purposes of 18 U.S.C. § 922(g)(1). None of these arguments have merit, and therefore we affirm.

## A.     Mr. Shigemura's Appeal of the Denial of the Motion to Suppress

Mr. Shigemura argues that the district court should have granted the motion to suppress because the traffic stop and search of the vehicle violated his Fourth Amendment rights in a number of ways. Specifically, Mr. Shigemura argues that (1) the traffic stop was not justified at its inception; (2) the ensuing detention was not reasonably related in scope to the circumstances of the traffic stop; (3) Meco's drug sniff constituted an "unreasonable general search" in light of the widespread contamination of currency with cocaine residue; and (4) Meco was not a sufficiently reliable narcotics dog. As discussed below, each of these contentions fails.

### 1.     Standard of Review

"In assessing a denial of a motion to suppress, this court accepts the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous." United States v. Chavez, 534 F.3d 1338, 1343 (10th Cir. 2008) (internal alteration and quotation marks and omitted). Moreover, this court must "view the evidence presented at the suppression hearing in the light most favorable to the Government." United States v. White, 584 F.3d 935, 941 (10th Cir. 2009). "Judging the credibility of the witnesses, determining the weight to be given to evidence, and drawing

13

reasonable inferences and conclusions from the evidence are within the province of the district court." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

"Ultimately, however, this court must review de novo the reasonableness of the government's action under the Fourth Amendment." Chavez, 534 F.3d at 1343. We also keep in mind that the government bears the burden of proving the reasonableness of a search or seizure. Id.

### 2. The Traffic Stop Was Justified at Its Inception.

In applying the Fourth Amendment protections against unreasonable searches and seizures, the Supreme Court has recognized three types of police-citizen encounters: consensual encounters, investigative detentions, and arrests. White, 584 F.3d at 944-45. Because a routine traffic stop is "more analogous to an investigative detention than a custodial arrest," the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968), guide this Court's determination as to the reasonableness of a traffic stop. Hunnicutt, 135 F.3d at 1348. Specifically, we examine whether the traffic stop was (1) "justified at its inception," and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

"A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009). Thus, "the government need not show a violation actually occurred to justify an initial traffic stop."

14

Hunnicutt, 135 F.3d at 1348. We look "only at whether the stop was objectively justified; the officer's subjective motives are irrelevant." Chavez, 534 F.3d at 1344 (internal quotation marks omitted).

At the suppression hearing in this case, Trooper Hyde testified that he pulled Mr. Shigemura over because he observed Mr. Shigemura make at least two unsafe lane changes. Specifically, Trooper Hyde testified that Mr. Shigemura failed to signal when he left the right lane of the two main traffic lanes of I-44 to enter into the toll-plaza area, and again, once inside the toll-plaza area, when he crossed over to reach the open toll booth on the far right side of the toll plaza. On appeal, Mr. Shigemura does not contest the fact that he failed to use a turn signal; rather, he argues that he committed no traffic violation because he was not legally required to use a turn signal under the circumstances. Mr. Shigemura is incorrect.

Under Oklahoma law, a motorist crossing a traffic lane is required to use a turn signal. Section 11-309 of Title 47 of the Oklahoma Statutes states as follows:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following requirements in addition to all others consistent herewith shall apply.
> . . . .
> 2. A vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his intention to change lanes.

Okla. Stat. tit. 47, § 11-309. In an effort to get around this statute, Mr. Shigemura argues that because signs on I-44 designated the right lane of the turnpike as the "cash lane" for

15

the toll plaza well before the turnpike branched off, no separate "lane" formed between this right lane and the toll-plaza area, and thus no signal was required.[6] However, the Tenth Circuit, applying Oklahoma law, has squarely addressed this issue, and has concluded that a turn signal is always required when entering a toll-booth area from the main turnpike. See United States v. Manjarrez, 348 F.3d 881, 885 (10th Cir. 2003) (considering similar argument involving Stroud toll plaza (the same toll plaza involved in our case), and agreeing with district court that "leaving the turnpike to go on to the toll plaza is leaving a lane as contemplated by Oklahoma statutes and therefore, precipitates an obligation to signal" (internal quotation marks omitted)).

Accordingly, Mr. Shigemura's failure to signal as he exited the turnpike and entered into the toll-plaza area constituted a violation of Oklahoma law, and thus the traffic stop was justified at its inception. We therefore need not reach the second issue of whether Mr. Shigemura was required to signal again once he was in the toll-plaza area.

---

[6] On appeal, Mr. Shigemura also argues that Section 11-604 of Title 47, which requires a signal before turning a vehicle "in the event any other traffic may be affected by such movement," Okla. Stat. tit. 47, § 11-604(A), is inconsistent with Section 11-309, and that this inconsistency should be resolved in his favor. However, Mr. Shigemura did not make this argument below, and therefore has waived it. See Fed. R. Crim. P. 12(b)(3)(C), (e); White, 584 F.3d at 948 ("Th[e] waiver rule applies not only when a defendant fails to file any pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion that he did file.")

16

3.      The Detention Was Reasonably Related in Scope to the
            Circumstances of the Traffic Stop.

In addition to being justified at its inception, a lawful traffic stop must be

"reasonably related in scope to the circumstances which justified the interference in the

first place." Terry, 392 U.S. at 20. That is, "[t]he investigative detention usually must

last no longer than is necessary to effectuate the purpose of the stop, and the scope of the

detention must be carefully tailored to its underlying justification." Hunnicutt, 135 F.3d

at 1349 (internal quotation marks omitted). In accordance with these principles, we have

held that a law enforcement officer conducting a traffic stop "may generally request a

driver's license, registration, and other required papers, run requisite computer checks,

and issue citations or warnings as appropriate." United States v. Rosborough, 366 F.3d

1145, 1148 (10th Cir. 2004). In addition, "an officer may ask questions, whether or not

related to the purpose of a traffic stop, if they do not excessively prolong the stop."

United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010). However, "[o]nce

an officer returns the driver's license and registration, the traffic stop has ended and

questioning must cease; at that point, the driver must be free to leave." United States v.

Villa, 589 F.3d 1334, 1339 (10th Cir. 2009). Thus, "[a] seizure that is justified solely by

the interest in issuing a warning ticket to the driver can become unlawful if it is

prolonged beyond the time reasonably required to complete that mission." Illinois v.

Caballes, 543 U.S. 405, 407 (2005).

Nonetheless, a "traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." White, 584 F.3d at 949 (internal quotation marks omitted). In addition, "further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349.

Mr. Shigemura argues that the detention in this case violated his Fourth Amendment rights because (1) the time it took Trooper Hyde to issue a warning ticket for a lane infraction—21 minutes and 45 seconds—was unreasonable, (2) Mr. Shigemura did not consent to additional questions after Trooper Hyde returned his license, and (3) Trooper Hyde did not have reasonable suspicion to detain Mr. Shigemura further once he had returned Mr. Shigemura's license. As discussed below, Mr. Shigemura's arguments are unavailing because (1) the duration of the stop was reasonable under the circumstances and (2) Trooper Hyde had reasonable suspicion to prolong the detention by the time he returned Mr. Shigemura's license and gave him a copy of the warning notice.

          (a)      The duration of the stop was not unreasonable under the circumstances.

Based on the evidence presented at the suppression hearing, the district court found that Trooper Hyde "diligently obtained the information he needed in order to accomplish the lawful purpose for which he stopped [Mr. Shigemura and Mr. Kitchell],

18

which was issuing a warning for a traffic violation," and that "any delay that occurred was due to [Trooper Hyde's] need to move back and forth between his patrol car and Defendants' vehicle in order to question all three men." (SROA, vol. i at 153.) The court further found that Trooper Hyde finished writing the warning ticket and informed Mr. Shigemura that he was free to go shortly after performing the other permissible aspects of the stop, including obtaining the defendants' information, performing criminal-history checks, and confirming that none of the defendants had outstanding warrants.

These findings by the district court were not clearly erroneous. A review of the traffic stop, broken down by the tasks Trooper Hyde completed, indicates that the overall duration of the stop was not unreasonable under the circumstances. See supra Part I.A. In the course of the stop, Trooper Hyde performed such reasonable tasks as (1) explaining the reason for the stop, (2) obtaining information from all three occupants of the vehicle, (3) examining the car rental agreement and inquiring as to why Mr. Shigemura was driving when the car was leased to Mr. Kitchell, and (4) requesting and waiting for a warrant check to be performed on all three individuals. Indeed, the warrant check alone took almost nine minutes to complete. And, as the district court correctly noted, Trooper Hyde had to walk back and forth between cars more than once to obtain and confirm information. Under these circumstances, we cannot say that the twenty-two minute interval from the beginning of the stop to the point at which Trooper Hyde returned Mr. Shigemura's driver's license was unreasonable.

19

(b)  Trooper Hyde had reasonable suspicion to prolong the detention by the time he returned Mr. Shigemura's license and gave him a copy of the warning notice.

"To determine whether an officer has a reasonable suspicion to detain beyond the scope of the traffic stop, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Davis, 636 F.3d 1281, 1290-91 (10th Cir. 2011) (internal quotation marks omitted). Although the government bears the burden of proving the reasonableness of an officer's suspicion, Simpson, 609 F.3d at 1146, "[r]easonable suspicion is not, and is not meant to be, an onerous standard," id. at 1153. "While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Davis, 636 F.3d at 1291 (internal quotation marks omitted). Indeed, "[a] factor may raise objectively reasonable suspicions even if it is not by itself proof of any illegal conduct and is quite consistent with innocent travel." White, 584 F.3d at 950 (internal quotation marks omitted).

"In deciding whether the government has met its burden of showing reasonable suspicion, we judge the officer's conduct in light of common sense and ordinary human experience, and we accord deference to an officer's ability to distinguish between innocent and suspicious actions." Simpson, 609 F.3d at 1146 (citation and internal quotation marks omitted). Moreover, "we must view the evidence presented at the suppression hearing in the light most favorable to the government" and defer to the

20

district court's finding of facts "even when, as here, there is video tape of the stop and detention." Id.

In this case, Trooper Hyde testified that during the detention he suspected that Mr. Shigemura, Mr. Kitchell, and Mr. Sprous may have been involved in some type of criminal activity based on the inconsistencies in their stated travel plans, their extreme nervousness, and the fact that they were in a rental car. As discussed below, the totality of these factors—particularly the stark inconsistencies in the defendants' travel plans— formed a sufficient basis for Trooper Hyde reasonably to suspect criminal activity, and justified his continued detention of the defendants after he returned Mr. Shigemura's driver's license and gave him a copy of the warning notice.

(i)     Inconsistent travel plans

We have repeatedly stated that "as part of a legitimate traffic stop" an officer may ask a motorist about his or her travel plans. United States v. Santos, 403 F.3d 1120, 1132 n.6 (10th Cir. 2005). The motorist's or his passengers' inconsistent statements in response to such questions can give rise to reasonable suspicion of criminal activity. Davis, 636 F.3d at 1291; Simpson, 609 F.3d at 1150.

At the suppression hearing, Trooper Hyde testified that the defendants' inconsistent travel plans caused him to suspect potential criminal activity. In particular, he described the following inconsistencies as contributing to his suspicion: (1) Mr. Shigemura's differing explanations as to why he was going to Oklahoma City; (2) Mr. Shigemura's statement that he did not know where his passengers—Mr. Kitchell and Mr.

21

Sprous—would be staying once they got to Oklahoma City; (3) Mr. Kitchell's statement that they were going to Texas to see Mr. Shigemura's family, which was inconsistent with Mr. Shigemura's statement that they were only going to Oklahoma City; (4) Mr. Sprous's statements that he was just "along for the ride," that he would perhaps "go to some casinos," and that he did not have any family in Oklahoma City, which were inconsistent with Mr. Shigemura's statement that Mr. Sprous was going to visit an uncle in Oklahoma City to ask about work.

Faced with these inconsistencies, it is reasonable that Trooper Hyde would suspect potential criminal activity. Accordingly, this factor strongly supports a finding that Trooper Hyde acted reasonably in further detaining the defendants for additional investigation after completing the warning notice and returning Mr. Shigemura's license.

(ii)     Nervousness

"An individual's nervousness during a traffic stop is another fact that may contribute marginally to a reasonable suspicion of illegal activity." Davis, 636 F.3d at 1291. However, we have recognized that nervousness is a common and natural reaction to an interaction with a police officer, whether one is innocent or guilty. Simpson, 609 F.3d at 1147. Therefore, unless an individual's display of nervousness "is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." Santos, 403 F.3d at 1127 (internal quotation marks omitted). Nonetheless, "[i]n undertaking this analysis, we bear in mind that the officer (and not the court) was present

22

at the encounter, and the officer (and not the court) has the training and experience to evaluate and compare the reactions of motorists to questioning." Id. at 1128.

At the suppression hearing, Trooper Hyde testified that Mr. Shigemura appeared to be very nervous during their conversation in the patrol car:

> As I talked with him about the nature of the trip, he became very anxious, very nervous. Like I said, he was hesitant as he would answer the questions, became animated on several different occasions as far as giving me the answer to simple detail questions. . . . He was very animated. He pulled his glasses off and put them back on several times.
> . . . .
> . . . He'd move his hands, I mean as he was answering questions. There wasn't any just "yes" or "no" answers, very seldom. As far as getting detailed about the trip, he would seem to be searching for the answers. He'd move his hands and shift his weight back and forth in the seat, fumble with his glasses, things of that nature.

(SROA, vol. iii, pt. i at 31:19-32:12.) Trooper Hyde further testified that Mr. Kitchell and Mr. Sprous "both too appeared to be very nervous":

> I noticed that as I was talking to them, Mr. Kitchell, he was very hesitant on giving me answers to detailed question[s]—any detailed answers to the questions I was asking. . . . He was sweating, just profusely sweating from his face. As he gave his ID to me, I noticed his hand was visibly trembling as he gave his ID—when I took it from him out of his hand. And Mr. Sprous's hand was also trembling, visibly trembling when I took his ID from him as well.

(Id. at 32:24, 33:1-10.) Based on this testimony, the district court found that the defendants displayed "visible nervousness," which contributed to Trooper Hyde's "articulable and reasonable suspicion to detain Defendants in order to determine whether the vehicle might contain contraband." (SROA, vol. i at 155.)

On appeal, Mr. Shigemura argues that Trooper Hyde's testimony is not credible and that a review of the videotaped footage of Mr. Shigemura's demeanor during the stop belies any notion that he was sufficiently nervous during the stop to warrant reasonable suspicion. Thus, Mr. Shigemura argues that any alleged nervousness on his part should not be considered in this case, especially in light of the limited significance of this factor and this Court's concern over its abuse. A review of the videotape of Mr. Shigemura's interaction with Trooper Hyde lends some credence to Mr. Shigemura's argument that any nervousness he displayed was not unusual. However, the district court was entitled to rely on Trooper Hyde's testimony. See Santos, 403 F.3d at 1128 ("In addition to viewing the video tape, the district court heard the testimony of Trooper Peech and [the defendant], and it is in the best position to assess the credibility of that testimony."). In this case, the district court's factual finding that the defendants displayed "visible nervousness" was not clearly erroneous. Thus, this Court concludes that this factor reasonably—albeit marginally—contributed to Trooper Hyde's suspicion of criminal activity.

(iii)    Use of a rental car

This Court has suggested that the use of a rental car can potentially contribute to an officer's reasonable suspicion of drug trafficking. See Davis, 636 F.3d at 1291; United States v. Williams, 271 F.3d 1262, 1270 (10th Cir. 2001). However, at the suppression hearing Trooper Hyde acknowledged that it was not unusual for people to drive rental cars on the turnpike system, and his suspicion regarding the rental car

apparently stemmed from its inconsistency with the defendants' purported travel plans. Accordingly, the fact that the defendants drove a rental car is entitled to little weight, except to the extent it further evidences inconsistencies in the defendants' purported travel plans.

(iv)    <u>Totality of the circumstances</u>

As discussed above, in determining whether an officer had reasonable suspicion to prolong a detention, we look to the "totality of the circumstances" surrounding the traffic stop. <u>Davis</u>, 636 F.3d at 1290-91. In this case, we conclude that the totality of the circumstances—particularly the inconsistencies in the defendants' purported travel plans as relayed to Trooper Hyde—gave rise to reasonable suspicion of criminal activity well before Trooper Hyde provided Mr. Shigemura with a copy of the warning notice and returned his driver's license. We therefore see no Fourth Amendment violation in Trooper Hyde's continued detention of the appellants past this point.[7]

> 4.    <u>Meco's Positive Alert Provided Probable Cause to Search the Vehicle, Notwithstanding Any Potential Contamination of Currency Inside the Vehicle.</u>

Mr. Shigemura next argues that the canine "sniff" and subsequent search of the rental car was unconstitutional in light of the alleged widespread contamination of

---

[7] Our conclusion forecloses Mr. Shigemura's remaining argument on appeal that the continued detention violated his Fourth Amendment rights because he did not consent to additional questions after Trooper Hyde returned his license. Whether or not Mr. Shigemura consented, the continued detention was permissible in light of Trooper Hyde's reasonable suspicion of criminal activity.

currency with trace amounts of cocaine. Specifically, Mr. Shigemura argues that where a canine sniff is conducted around an occupied car, this contamination can lead a narcotics-detection dog to alert or indicate to the currency on the person in the car, which then allows officers to search the car even though the car does not contain any narcotics. Thus, Mr. Shigemura argues, a canine sniff of an occupied car effectively permits general searches of vehicles in violation of the underlying rationales of Caballes, 543 U.S. 405, and United States v. Place, 462 U.S. 696 (1983).[8]

Mr. Shigemura's argument, while perhaps novel, is unavailing. As discussed below, although some courts have expressed concern over the reliability of canine sniffs in light of research finding that a large percentage of circulated currency is tainted with trace amounts of cocaine, Mr. Shigemura points to no authority undermining the well-established principle that a positive alert from a reliable narcotics-detection dog gives rise to probable cause to search a vehicle. Moreover, in this case Meco was specifically trained to differentiate between narcotics and circulated currency, and thus there is no reason to doubt the reliability of his alert on this basis.

---

[8] In Place, the Supreme Court held that a canine sniff of luggage is not a "search" under the Fourth Amendment because it "does not expose noncontraband items that otherwise would remain hidden from public view," but rather "discloses only the presence or absence of narcotics, a contraband item." 462 U.S. at 707. In Caballes, the Supreme Court applied this rationale in holding that "the use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate privacy interests," 543 U.S. at 409, and thus that an officer need not have reasonable, articulable suspicion of drug activity to conduct a canine sniff during a lawful traffic stop, id. at 407, 409.

Mr. Shigemura is correct that numerous studies have determined that a substantial percentage of United States currency in circulation contains traces of cocaine, and that several courts accordingly have expressed concern that this contamination may result in false alerts or indications by narcotics-detection dogs. See Caballes, 543 U.S. at 411-12 (Souter, J., dissenting) (arguing that the assumption that narcotics-detection dogs are infallible is "belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine"); United States v. $10,700.00 in U.S. Currency, 258 F.3d 215, 230 (3d Cir. 2001) (noting that "several of our sister circuits recently have called into question the evidentiary significance of a positive reaction to currency in determining whether there is probable cause to forfeit the money in light of studies indicating that a large percentage of United States currency is contaminated with sufficient traces of drug residue to cause a canine to 'alert' to it"); United States v. Buchanan, 213 F.3d 302, 311 (6th Cir. 2000) ("Prior cases support the proposition that because a high percentage of currency in circulation is tainted with a scent or residue of narcotics, evidence of a positive indication by a drug-sniffing dog may have minimal evidentiary value."); United States v. $5,000 in U.S. Currency, 40 F.3d 846, 849 (6th Cir. 1994) (finding "the evidentiary value of the narcotics dog's alert to be minimal" in light of evidence regarding narcotics contamination of currency); United States v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1043 (9th Cir. 1994) (finding that in light of currency contamination, "the continued

27

reliance of courts and law enforcement officers on [a dog alert] to separate 'legitimate' currency from 'drug-connected' currency is logically indefensible." (alteration in original) (internal quotation marks omitted)).[9]

However, Mr. Shigemura points to no binding authority for the proposition that potential currency contamination renders a canine sniff by a certified narcotics-detection dog unreliable, and we decline to adopt this view.[10]  Probable cause to search a vehicle requires only "a fair probability that contraband or evidence of a crime will be found in [the vehicle]." Illinois v. Gates, 462 U.S. 213, 238 (1983).  This Court has repeatedly

---

[9] Most of the cases addressing this issue do so in the context of forfeiture proceedings, which look to whether there is probable cause that the currency "was used in connection with or was derived from a drug transaction." United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 877 n.5 (10th Cir. 1992).  Nonetheless, the rationale underlying courts' concern in those cases is potentially instructive in the car-search context; that is, if a dog's alert to currency is not probative of whether that currency has a connection to a drug transaction because the currency could just as easily be "innocently" tainted, then arguably a dog's alert to a car is not probative of whether the car contains more than microscopic amounts of narcotics, because the dog could also be alerting to innocently-tainted currency.  See id. at 876 ("The test for determining probable cause for forfeiture purposes is the same as applies in arrests, searches and seizures.").

[10] We note that a number of our sister circuits have expressed skepticism as to whether the contamination of currency undermines the reliability of canine sniffs. See United States v. Funds in the Amount of $30,670.00, 403 F.3d 448, 457-60 (7th Cir. 2005) (noting criticism of "the currency contamination theory and its uncritical adoption by courts" and concluding that "dog alerts to currency should be entitled to probative weight"); United States v. $242,484.00 in U.S. Currency, 389 F.3d 1149, 1165-66 (11th Cir. 2004) (noting the differing views reached by other courts about the "global contamination theory" and declining "to write the theory into the law of this circuit"); Buchanan, 213 F.3d at 311-12 (6th Cir.) (citing cases concluding that a positive dog sniff may retain probative weight despite widespread contamination of currency and noting "the uncertainty of this issue").

28

recognized that a reliable narcotics-detection dog's alert to a vehicle suffices to establish this "fair probability." See United States v. Parada, 577 F.3d 1275, 1282 (10th Cir. 2009) ("A trained narcotic dog's detection of the odor of an illegal substance emanating from a vehicle creates a 'fair probability' that there is contraband in that vehicle."); United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993) ("[A] dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband."). Accordingly, "it is well-established that a dog sniff provides the requisite probable cause to search a vehicle for drugs." Villa, 589 F.3d at 1341. Mr. Shigemura has not shown that potential currency contamination has undermined the significance of a positive dog alert in indicating a fair probability of the presence of contraband, and thus probable cause to search.

Moreover, in this case Trooper Hyde specifically testified that Meco was trained to distinguish the scent of narcotics from the scent of other items, including circulated currency. (See SROA, vol. iii, pt. i at 66:2-8 ("During different training scenarios we'll have—we'll go get uncirculated bills, brand new bills from a bank that [haven't] been in circulation, train on those, and randomly we'll train on circulated currency as well as just working on the side of the road; you run your dog around the vehicle, if there's a wallet or something laying on the seat, just see if he'll alert or indicate to it."); see also id. at 66:9-11 (testifying that Meco is not trained to alert and indicate to the smell of currency); 104:10-12 ("We place currency in the training scenario to make sure that he is proofing— what we call proofing on an odor."); 109:5-7 ("As I explained earlier, [we proof] off the

29

different odors, whether it be uncirculated currency, circulated currency . . . .").) This evidence undercuts any argument that Meco's alert was unreliable based on the potential contamination of currency present in the vehicle at the time. Accordingly, we reject Mr. Shigemura's contention that potential currency contamination rendered the sniff and subsequent search of the rental car in this case unconstitutional.

> 5. The District Court Did Not Clearly Err In Finding Meco to Be a Reliable Narcotics-Detection Dog.

Mr. Shigemura next argues that Meco's alert could not give rise to probable cause to search the vehicle because Meco was not a reliable narcotics-detection dog. Specifically, Mr. Shigemura argues that at the time of the stop, the Oklahoma Administrative Code provided that narcotics-detection canine teams "shall be certified only in the detection of controlled dangerous substances for which the dog scores an eighty per cent (80%) higher [sic] 'find' rate, and not more than a twenty per cent (20%) 'false response' rate." Okla. Admin. Code § 390:30-1-5(d) (2004).[11] Mr. Shigemura argues that the government failed to produce any records showing that Meco satisfied the 80%/20% regulatory requirement as part of his certification. Mr. Shigemura further argues that the records that the government did produce—including OHP Utilization Reports tracking Meco's performance in the field—show that out of Meco's twenty-

---

[11] This regulation was amended in July 2009, and the applicable subsection now provides that canine teams "shall be certified only in the detection of controlled dangerous substances for which the dog passes the certification test." Okla. Admin. Code § 390:30-1-5(d) (effective July 11, 2009) (emphasis added).

30

seven alerts, only eighteen of those revealed the presence of narcotics. Mr. Shigemura asserts that this indicates a false-response rate of 33.3%, well in excess of the regulatory 20% limit. Mr. Shigemura also contends that none of the training records show that Meco was trained or tested on his ability to distinguish tainted from non-tainted currency. As discussed below, Mr. Shigemura has not satisfied his burden of showing Meco to be unreliable.

"[A] drug dog's alert establishes probable cause only if that dog is reliable." United States v. Ludwig, 641 F.3d 1243, 1251 (10th Cir. 2011); see also United States v. Clarkson, 551 F.3d 1196, 1203 (10th Cir. 2009) (describing this Court's precedent as indicating that a narcotics-detection dog "must be 'reliable' or 'trained' in order for an alert to support probable cause"). A party seeking to suppress evidence found during a search after a positive dog alert bears the burden of proving that the dog is unqualified. Clarkson, 551 F.3d at 1203. In this case, the district court heard evidence on Meco's qualifications and found him to be a reliable narcotics-detection dog. We review the district court's finding for clear error. See Parada, 577 F.3d at 1283.

We recently addressed the issue of a narcotics-detection dog's reliability in Ludwig. In that case, we rejected the notion that a court considering a challenge to a narcotics dog's reliability must "mount a full-scale statistical inquisition into [the] dog's history." 641 F.3d at 1251. Rather, because "canine professionals are better equipped than judges to say whether an individual dog is up to snuff," we held that "the judicial task" is limited "to assessing the reliability of the credentialing organization, not

31

individual dogs." Id. If a challenger shows that the credentialing organization is "a sham," then "its certification . . . no longer serve[s] as proof of reliability." Id.

In this case, there is no dispute that at the time of the stop Meco was certified by the applicable credentialing organization, the Oklahoma Council on Law Enforcement, Education and Training ("CLEET"). While Mr. Shigemura does not allege that CLEET is "a sham," he does contend that the government's failure to produce documentation of Meco's satisfaction of the specific statutory requirements for certification undermines the probative value of CLEET certification in establishing Meco's reliability. He further argues that relying solely on Meco's certification in cases such as this would sanction "the right hand of one police agency . . . facilitat[ing] searches of automobiles or luggage by the left hand of the same police agency using dogs whose reliability cannot be verified." (S. Aplt. R. Br. at 18.) Accordingly, we construe Mr. Shigemura's argument as challenging CLEET as a credentialing organization in this case.

Nonetheless, Mr. Shigemura has not met his burden of showing that Meco was unreliable. Even though the government did not produce specific records of Meco's testing during certification, the government did produce copies of Meco's "Canine Team Certification Test," showing that Meco was tested on and passed certification tests for each of the four drugs. In other words, the appropriate "canine professionals" deemed Meco to be reliable, and Mr. Shigemura points to no evidence that CLEET is unfit to make this determination.

32

Moreover, we have recognized that in certain situations, a narcotics-detection dog's reliability can be established by means other than proof of certification. See Ludwig, 641 F.3d at 1251 n.3 ("An uncertified dog's accuracy could still, in theory at least, be established by examining its training history and record for reliability."); Clarkson, 551 F.3d at 1204 ("While successful completion of a training course and a current certification would be satisfactory, we do not exclude the possibility that reliability can be established by other evidence."). At the suppression hearing in this case, Trooper Hyde described the training that he and Meco performed, including training on differentiating narcotics from circulated currency and training involving "blank" (narcotics free) vehicles. Trooper Hyde testified that he tried to train Meco for a minimum of sixteen hours per month. The government also produced approximately seventy-three pages of OHP Police Service Dog Training Reports reflecting Meco's training sessions, as well as thirty-two pages of Utilization Reports reflecting Meco's training and experience in the field. The lack of further documentation concerning Meco's certification process does not suffice to meet Mr. Shigemura's burden of establishing Meco as unreliable. Under these circumstances, the district court did not clearly err in finding Meco to be a reliable narcotics-detection dog.[12]

---

[12] We also reject Mr. Shigemura's suggestions in his brief and at oral argument that in United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997), we established a bright-line 70% success rate as the dividing line of whether a narcotics dog is sufficiently reliable. Rather, we simply concluded in that case that a success rate of 70-80% met "the

Continued . . .

**B. Mr. Shigemura's Appeal of the District Court's Application of the Four-Point Sentencing Enhancement Under U.S.S.G. § 2K2.1(b)(6) for Possession of a Firearm in Connection with Another Felony Offense**

Mr. Shigemura argues that the district court erred in calculating his Sentencing Guidelines range by applying a four-point enhancement under Section 2K2.1(b)(6), which provides for such an enhancement where, inter alia, a defendant possesses a firearm in connection with another felony offense. The district court applied the enhancement to Mr. Shigemura's Guidelines calculation based on evidence that at the time of his arrest, Mr. Shigemura possessed firearms in connection with the state-law offense of transporting funds intended for use in a drug transaction. As discussed below, based on the significant evidence presented by the government that the money found in the vehicle's trunk constituted either drug proceeds or funds to be used in a drug transaction, the district court did not clearly err in applying the enhancement.

_____

liberal standard for probable cause." Id. at 1378. We did not prescribe this rate as a minimum threshold. Indeed, in Ludwig we made clear that "[m]ore than percentages, precedent and common sense rules (like reliance on certification processes) ought to inform the probable cause analysis." 641 F.3d at 1252.

We note, however, that in Ludwig we indicated that if "pushed to do so" we would recognize the 58% success-rate by the dog in that case to be sufficient to give rise to probable cause. Id. Here, the records cited by Mr. Shigemura reflect that Meco successfully alerted to drugs 18 out of 27 times, yielding a percentage (66.7%) even higher than that in Ludwig.

1.      Standard of Review

"When reviewing the district court's application of the sentencing guidelines, this Court reviews the district court's findings of fact for clear error and legal conclusions de novo." United States v. Beltran, 571 F.3d 1013, 1020 (10th Cir. 2009).  Under this standard of review, we will not disturb a factual finding of the district court "unless it has no basis in the record," and "we view the evidence and inferences therefrom in the light most favorable to the district court's determination." United States v. Mozee, 405 F.3d 1082, 1088 (10th Cir. 2005).

2.      The Government Presented Sufficient Evidence to Establish That the Enhancement Applies.

Section 2K2.1(b)(6) applies where a defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6). Application Note 14 to this section defines "in connection with" as mandating that the enhancement applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." Id. cmt. n.14(A).  The government has the burden of proving, by a preponderance of the evidence, that Section 2K2.1(b)(6) applies. See United States v. Pantelakis, 58 F.3d 567, 568 (10th Cir. 1995).

In this case, the government argued that Section 2K2.1(b)(6) applied because Mr. Shigemura possessed firearms in connection with the state-law felony offense of

35

concealing or transporting drug proceeds or funds intended for use in a drug transaction, as proscribed by Section 2-503.1 of Title 63 of the Oklahoma Statutes.[13] Specifically, the government contended that the firearms found in the rental car "facilitated or had the potential to facilitate [Mr. Shigemura's] concealment and transportation of the $41,983" found in the backpack, and that these funds constituted "either drug proceeds or money soon to be used in a drug transaction." (SROA, vol. i at 243.)

The government cited extensive evidence to support its argument, including evidence that (1) one of the handguns was found in the same backpack as the $41,983; (2) the other five handguns were also found in the trunk in which the backpack was found; (3) an "Ionscan" of the $41,983 indicated traces of cocaine and methamphetamine

---

[13] This statute provides that it is a felony for a person to do one or more of the following:

> A. . . . knowingly or intentionally to receive or acquire proceeds and to conceal such proceeds, or engage in transactions involving proceeds, known to be derived from any violation of [controlled dangerous substances statutes] . . . [;]
> B. . . . knowingly or intentionally to give, sell, transfer, trade, invest, conceal, transport, or maintain an interest in or otherwise make available anything of value which that person knows is intended to be used for the purpose of committing or furthering the commission of any violation of [controlled dangerous substances statutes; or]
> C. . . . knowingly or intentionally to direct, plan, organize, initiate, finance, manage, supervise, or facilitate the transportation or transfer of proceeds known to be derived from any violation of [controlled dangerous substances statutes].

Okla. Stat. tit. 63 § 2-503.1(A)-(C). Before he was indicted on felony charges, Mr. Shigemura was charged in state court with violating Section 2-503.1.

residue on the currency; (4) a portion of the $41,983 was packaged so as to appear to consist of stacks of $100 bills; (5) while Mr. Shigemura was incarcerated, he engaged in several telephone conversations indicative of narcotics activity; (6) Mr. Shigemura received a text message from an area code in Texas on January 19, 2009, which stated, "if u cant find come across [sic] anything the price is still 400 tomorrow anytime"; (7) Mr. Kitchell received voice mail messages on his cell phone indicative of narcotics activity; and (8) Mr. Shigemura averred that he was the sole owner of the $41,983 in separate civil forfeiture proceedings, belying any argument that he had no knowledge of the money. (Id. at 238-42.) The district court concluded that this evidence, together with Mr. Shigemura's statement to Mr. Kitchell in the back of the patrol car that it would have been worse if the police had busted them "on the way back," was sufficient to establish that the money was being transported in connection with a drug felony, and thus that the government had established the underlying felony supporting the enhancement.

On appeal, Mr. Shigemura argues that the government failed to meet its burden of establishing that the currency found in the car was connected with drug activity, and thus that the district court erred by applying the enhancement on nothing more than "suspicion[s] of general criminality." (S. Aplt. Br. at 55.) We disagree. Taken together, the evidence presented by the government was more than sufficient to show that the firearms possessed by Mr. Shigemura had the potential to facilitate another felony offense; in this case, transportation or concealment of drug proceeds or funds intended to

37

be used in a drug transaction.  The district court's application of the four-point

enhancement under Section 2K2.1(b)(6) was therefore not clearly erroneous.

### C.    Mr. Kitchell's Appeal of the Denial of the Motion to Suppress

Mr. Kitchell challenges the district court's denial of the motion to suppress on

three bases.  He argues that (1) the traffic stop and search violated the Fourth

Amendment; (2) the canine sniff violated the Fourth Amendment; and (3) the video of the

conversation between Mr. Shigemura and Mr. Kitchell should not have been admitted

because they had a reasonable expectation of privacy in the patrol car.  As to Mr.

Kitchell's first two arguments, we have already determined that neither the stop nor the

canine sniff violated the appellants' Fourth Amendment rights, and so these arguments

are unavailing.[14]  With respect to his final argument, Mr. Kitchell did not raise this issue

below, and thus has waived it.  See Fed. R. Crim. P. 12(b)(3)(C), (e); White, 584 F.3d at

948-49.  In any event, Mr. Kitchell himself concedes that "all of the Circuits have held

there is no expectation of privacy to a conversation held by parties in the backseat of a

police car," (K. Aplt. Br. at 26), and that this Court reached this same conclusion under

_____

[14] In addition to the arguments raised by Mr. Shigemura, Mr. Kitchell argues that the traffic stop was unconstitutional because the "special emphasis" program of the Special Operations Division was akin to a "roving checkpoint" and "roving search," in that it effectively allowed troopers to pull over any car they wished for a minor infraction and then employ a "cookie cutter" approach towards building probable cause to search the vehicle.  (Kitchell Aplt. Br. ("K. Aplt. Br.") at 13-19.)  However, Mr. Kitchell did not raise this issue in the joint motion to suppress, nor has he shown good cause for considering the argument here.  Therefore, he has waived this argument.  See Fed. R. Crim. P. 12(b)(3)(C), (e); White, 584 F.3d at 948-49.

the facts of a case involving a stop and search like the one here, see United States v. Turner, 209 F.3d 1198, 1200-01 (10th Cir. 2000). For these reasons, we affirm the district court's denial of the joint motion to suppress.

### D. Mr. Kitchell's Challenge to the Sufficiency of the Evidence

Finally, Mr. Kitchell argues that there was insufficient evidence to support his conviction. Specifically, Mr. Kitchell contends that a reasonable jury could not have found that he had possession of the firearms found in the trunk of the rental car based on the evidence introduced at trial. Because this evidence was more than sufficient for a reasonable jury to find that Mr. Kitchell had constructive possession of the firearms in question, we affirm.

#### 1. Standard of Review

"We review the sufficiency of the evidence to support a jury verdict de novo and examine only whether taking the evidence, both direct and circumstantial, in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Phillips, 583 F.3d 1261, 1264 (10th Cir. 2009) (internal quotation marks omitted). "Therefore, the evidence supporting a jury verdict must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." Id. (internal quotation marks omitted). "We reverse a conviction only if no reasonable jury could have reached the challenged verdict." United States v. Hooks, 551 F.3d 1205, 1212 (10th Cir. 2009).

39

2.    The Government Introduced Sufficient Evidence for a Reasonable Jury to Find That Mr. Kitchell Had Constructive Possession of the Firearms Found in the Trunk of the Rental Car.

18 U.S.C. § 922(g)(1) provides that it is unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  To obtain a conviction under this statute, "the government must establish three elements beyond a reasonable doubt: (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce." United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997).  At trial, Mr. Kitchell stipulated that the first and third prongs of this inquiry were met.  Thus, the only issue on appeal is whether the government presented sufficient evidence that Mr. Kitchell knowingly possessed a firearm.

"As we have repeatedly held, possession can be actual or constructive." United States v. Jameson, 478 F.3d 1204, 1209 (10th Cir. 2007).  "Constructive possession exists when a person knowingly holds the power and ability to exercise dominion and control over [a firearm]." Id. (alteration in original) (internal quotation marks omitted).  "Stated another way, the government must show that the defendant had knowledge of and access to the firearm." Hooks, 551 F.3d at 1212.  In cases in which two or more people occupy the same vehicle, a defendant's knowledge of and access to a firearm can be inferred

40

from circumstantial evidence, as long as this evidence includes something other than mere proximity.  Id.  "The government must demonstrate some connection or nexus between the defendant and the firearm, which leads to at least a plausible inference that the defendant had  knowledge of and access to the weapon or contraband."  Id. at 1212-13 (citations and internal quotation marks omitted).

At trial, the government introduced excerpts of the video of the stop, including the following conversations between Mr. Shigemura and Mr. Kitchell in the patrol car:

**Mr. Shigemura** (upon seeing one of the troopers pull a gun from the interior of the car):  They found that f****** gun.
**Mr. Kitchell**:  They went through the trunk.
. . . .
**Mr. Shigemura**:  We've got some weapons charges, you dig what I'm saying?
**Mr. Kitchell**:  You ain't lying.
**Mr. Shigemura**:  Where was that other f****** nine?
**Mr. Kitchell**:  In the trunk.
**Mr. Shigemura**:  I know, where at?
**Mr. Kitchell**:  In the bag.
**Mr. Shigemura**:  It was in the bag?
**Mr. Kitchell**:  Yeah, they're going to get it out now.
**Mr. Shigemura**:  Hmm?
**Mr. Kitchell**:  They're getting it now.
**Mr. Shigemura**:  What?  The bag?
**Mr. Kitchell**:  Yeah, they got the bag on top [of the car], I think.  Or that's your bag.
**Mr. Shigemura**:  That's my bag.
. . . .
**Mr. Shigemura**:  Uh oh, more sh**.  John.
**Mr. Kitchell**:  My bag?
**Mr. Shigemura**:  Yup.
. . . .
**Mr. Kitchell**:  Oh, they're getting down to the pistols now?
**Mr. Shigemura**:  Mmm hmm.

(United States v. Kitchell, Supp. Record on Appeal, vol. v at 32:05-32:20; 37:35-41:00.)

Viewing this evidence in the light most favorable to the government, a reasonable jury could find that the government sufficiently demonstrated a connection or nexus between Mr. Kitchell and the firearms, leading to a plausible inference that Mr. Kitchell had knowledge of and access to the weapons.[15] Indeed, in light of Mr. Kitchell's unambiguous statements, this is certainly not a case where "no reasonable jury could have reached the challenged verdict." Hooks, 551 F.3d at 1212. We therefore affirm the jury's verdict.

## III. CONCLUSION

For the reasons discussed above, we affirm (1) the district court's denial of the appellants' joint motion to suppress, (2) the district court's application of the sentencing enhancement under U.S.S.G. § 2K2.1(b)(6) to Mr. Shigemura's sentence, and (3) the jury's verdict.

---

[15] Mr. Kitchell also argues that the district court erred in admitting the firearms into evidence and in not precluding the government from referring to the rental vehicle as "the defendant's car" at trial. However, Mr. Kitchell concedes that he did not object to the admission of the firearms or to the references to "the defendant's car" at trial, and thus that these challenges are reviewed for plain error. In light of the evidence described above, the uncontested fact that the firearms were found in the vehicle, and the uncontested fact that Mr. Kitchell had rented the vehicle, the district court did not plainly err by admitting the firearms or by failing to preclude, sua sponte, the government from referring to "the defendant's car."

42