**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANTOINE DWAYNE FRAZIER,

    Defendant - Appellant

No. 20-4131

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH
### (D.C. No. 4:19-CR-00141-DN-1)

---

John C. Arceci, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Nathan H. Jack, Assistant United States Attorney (Andrea T. Martinez, Acting United States Attorney, and Ryan D. Tenney, Assistant United States Attorney, on the brief), Salt Lake City, Utah, for the Plaintiff-Appellee.

---

Before **TYMKOVICH**, Chief Circuit Judge, **SEYMOUR** and **EBEL** Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Mr. Frazier appeals the district court's denial of his motion to suppress evidence obtained during a roadside search of his vehicle in 2019. *See United States v. Frazier*, 467 F. Supp. 3d 1144 (D. Utah 2020). He argues that the evidence was inadmissible

against him because it was the fruit of a traffic stop that law enforcement officers impermissibly prolonged in violation of his Fourth Amendment right against unreasonable seizures. We agree and therefore reverse.

# I
# Background

The parties do not dispute the basic sequence of events leading to the search of Mr. Frazier's vehicle. On the morning of November 12, 2019, Trooper Adam Gibbs of the Utah Highway Patrol was working a stretch of Interstate 15 in Iron County. Posted in his usual spot in the median near mile marker 63, he was on the phone with a colleague when he noticed a black man headed north in a white SUV with Kansas plates. As it passed, the vehicle appeared to be "going a little fast," about five miles per hour over the posted limit. Rec., vol. I at 119. Trooper Gibbs pulled out to follow. Over the next several miles, the trooper paced the vehicle at between four and eight miles faster than the posted limit and twice observed Mr. Frazier change lanes after signaling for less than the two seconds required under Utah law. The trooper also ran the plates to see if the vehicle had been reported stolen. Although it had not, the trooper turned on his flashers to pull over Mr. Frazier, who complied. It was 9:06 a.m.

At 9:07 a.m., the trooper exited his cruiser and approached Mr. Frazier's vehicle from the passenger side. As he did, he looked through the rear window and saw two bags, one of which was a duffle bag that "appeared to be somewhat new." Rec., vol. I at 43–46. When the trooper reached the front of the vehicle, Mr. Frazier rolled down the window about four inches. The trooper asked him to roll it down more, and Frazier complied,

rolling the window down another inch or two. As the two began to talk, the trooper noticed a bottle of spray deodorizer in the center console. When Mr. Frazier handed over his driver's license, the trooper noticed that it was from Iowa, although Mr. Frazier appeared to have an ID from another state in his wallet. When the trooper inquired about it, Mr. Frazier showed that it was an identification card from neighboring Missouri and bore the same information as his Iowa license. Mr. Frazier then handed over the vehicle's registration, which showed that it was a rental. When the trooper asked for the rental agreement, however, Mr. Frazier struggled to find it. As he searched, Gibbs asked about a bottle he saw among some trash in the passenger seat. Frazier handed it to him. Seeing that it was only ginger beer, Gibbs handed it back.

At this point, Trooper Gibbs broke from the conversation for a moment to peer into the back of Mr. Frazier's vehicle. When he returned, Mr. Frazier was on his phone looking up the rental company's confirmation. As he did, the trooper asked Frazier where he was coming from. After a momentary pause, Mr. Frazier said he was coming from his sister's residence in California. When the trooper repeated the question, Mr. Frazier looked up from his phone, repeated his answer, and told the trooper that he had found the contact number for the company. Mr. Frazier then attempted to hand the phone over so the trooper could call and verify the rental, but the trooper cut him off, saying, "Why don't you come on back here and we'll give them a call, if you don't mind coming back to my car real quick?" Trooper's Bodycam, 09:09:18. When Mr. Frazier declined, the trooper cut him off again, this time to ask Mr. Frazier how long he had been at his

3

sister's. Mr. Frazier paused for a moment and then asked the trooper why he was asking these questions, to which the trooper responded, "Because I ask everyone the same questions." *Id.* at 09:09:30. After another pause, Mr. Frazier asked again if the trooper wanted the rental company's phone number. The trooper said he did and began taking down the information. As he did, he asked if the rental company had sent him an email with the agreement. Mr. Frazier said he had been in the rental for a month because his car was in a wreck. The trooper then asked for Mr. Frazier's phone number and social security information. As the trooper jotted down the information, Mr. Frazier turned back to his phone. After the trooper finished, and while Frazier was still looking at his phone, the trooper abruptly asked him where in California he had been. After a beat, Mr. Frazier looked up and said he had been in Los Angeles.

The trooper returned to his cruiser at about 9:11 a.m. Significantly, however, he did not begin the standard procedures necessary to issue a citation. Instead, he immediately began trying to contact Deputy Shawn Peterson, a canine handler with the local sheriff's office, so he could come to the scene and perform a dog sniff of the vehicle. At first, the trooper tried contacting the deputy via the instant-messaging system on his vehicle's computer. When the deputy failed to respond to several messages, Trooper Gibbs tried to call him on the radio. When the deputy again failed to respond, the trooper asked dispatch to locate him and send him to the scene.

Around 9:14 a.m., Trooper Gibbs began filling out the citation. About a minute later, Deputy Peterson called back and, after a brief exchange, said he was on his way.

The trooper then continued to work on the citation until about 9:18 a.m., when he asked dispatch to run a criminal-history check on Mr. Frazier. Immediately following the exchange with dispatch, at about 9:19 a.m., the trooper logged into DEASIL, a database of information gleaned from the Drug Enforcement Administration's national network of license-plate readers. As explained by the trooper, the DEASIL system consists of a network of surveillance cameras placed on roadways around the country. When a vehicle passes through a node on the network, its license plate is automatically scanned into the database, allowing law enforcement to see where a vehicle has been and when. In Mr. Frazier's case, the DEASIL system had recorded his vehicle heading west on Interstate 70 in Kansas on November 9. Now, just three days later, he was in Utah, headed in the opposite direction.

Following the DEASIL search, at about 9:21 a.m., the trooper called the rental company, which confirmed that Mr. Frazier was the vehicle's authorized lessee and corroborated his prior statement that he had been renting the vehicle for about a month. The exchange took about two minutes.

At 9:22 a.m., while the trooper was on the phone with the rental company, Deputy Peterson arrived at the scene. Shortly after his arrival, as the trooper looked on, the deputy directed Mr. Frazier to exit the vehicle and then conducted a pat-down search. Upon finding a knife in Mr. Frazier's waistband, Deputy Peterson instructed Mr. Frazier to wait by the side of the road about 20 yards away from the vehicle. Around 9:24 a.m., the deputy had his dog sniff the vehicle. After the sniff was complete at 9:26 a.m.,

5

Deputy Peterson told the trooper that the dog had alerted on the vehicle, indicating the likely presence of contraband.

As Deputy Peterson relayed the news about the dog's alert, a dispatcher contacted Trooper Gibbs with the results of his records request: Mr. Frazier had pleaded guilty to manslaughter in 2006 but had no other criminal history since then. The trooper decided to move Mr. Frazier to the patrol car while he and Deputy Peterson searched the vehicle. Before doing so, however, they conducted another pat-down and found a .22 caliber pistol in Mr. Frazier's pants pocket. The officers then placed Mr. Frazier under arrest for being a felon in possession of a firearm and proceeded to search the vehicle. The duffle bag held only clothes and hygiene items, but the smaller bag held fentanyl pills and a kilo of cocaine.

A month after Mr. Frazier's arrest, the government indicted him on charges of possession of fentanyl with intent to distribute in violation of 21 U.S.C. § 841(a)(1); possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Shortly thereafter, Mr. Frazier filed a motion to suppress, arguing that the trooper had improperly prolonged the traffic stop to facilitate a dog sniff and thereby obtain probable cause to search his vehicle.

At the ensuing evidentiary hearing, Trooper Gibbs testified that he began to suspect that Mr. Frazier was carrying drugs early in the traffic stop based on the duffle bag in the cargo area, the "deceitful" way Mr. Frazier answered questions, and a belief

that he was trying to hide odors in his vehicle. Rec., vol. I at 57. The trooper said he found the duffle bag suspicious because, in his five years working traffic enforcement and drug interdiction, he had seen "a lot of large loads of narcotic that have just been one duffle bag sitting in the back." *Id.* at 46. He said he found Mr. Frazier's answers suspicious because he seemed to be pausing after questions, as if to "come up with the right answer but not necessarily the simple, correct answer." *Id.* at 57–58. As for his belief that Mr. Frazier was trying to mask odors in his car, the trooper cited Mr. Frazier's failure to roll the window all the way down and the air freshener he had seen in the center console, although he conceded on cross examination that he smelled neither air freshener nor contraband during the several minutes he spent interacting with Mr. Frazier through the window. The trooper further testified that the DEASIL records heightened these suspicions because quick turnarounds after distant car rides are, based on his training and experience, consistent with drug trafficking.

Following the hearing, the district court issued a written order denying Mr. Frazier's motion to suppress. Mr. Frazier then entered a conditional guilty plea, leading to the instant appeal. "When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (quoting *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017)).

## II
## Discussion

The Fourth Amendment guarantees a person's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Because a traffic stop is a seizure for constitutional purposes, it is subject to the Fourth Amendment's reasonableness standard. *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020). To be reasonable, a traffic stop must be justified at its inception and the officer's actions must be "reasonably related in scope" to the "mission of the stop." *Id.* (quoting *Mayville*, 955 F.3d at 829).

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the Supreme Court explained that an officer's authority to seize the occupants of a vehicle ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 354. Reasonableness in this context is defined by what the officer actually does. *Id.* at 357. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id.* (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). An officer may conduct certain unrelated inquiries during the stop, but he may not do so in a way that prolongs it absent the reasonable suspicion ordinarily required to detain an individual. *Id.* at 355.

Under *Rodriguez*, therefore, an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that "prolongs" (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion. *See id.* at 357–58; *Mayville*, 955 F.3d at 829–30. Even *de minimis* delays caused by unrelated inquiries violate the Fourth

8

Amendment in the absence of reasonable suspicion. *Mayville*, 955 F.3d at 830 (citing

*Rodriguez*, at 355–57).

Mr. Frazier does not contest the validity of the initial stop, arguing instead that the

trooper impermissibly prolonged the traffic stop in two ways: first, by spending several

minutes trying to arrange the dog sniff before beginning to work on the citation, and then

by interrupting his work on the citation to search the DEASIL database. Under

*Rodriguez*, our task is to determine whether these activities diverted from the traffic-

based mission of the stop in a way that prolonged it and, if so, whether the trooper had

the reasonable suspicion necessary to justify the investigative detours when they

occurred.[1]

**A.**

Although the district court held otherwise, we think it clear that the trooper's

efforts to arrange for a dog sniff diverted from the traffic-based mission of the stop and

thereby extended its duration.  The government does not argue to the contrary, and for

good reason. The reasonableness of a seizure depends on "what the police in fact do."

*Rodriguez*, 575 U.S. at 357. And each minute that the trooper spent arranging the dog

---

[1] Mr. Frazier also argues that the trooper unreasonably prolonged the stop when he ceased to work on the citation a third time so he could watch Deputy Peterson carryout the dog sniff. We need not address this claim, however. The government concedes that, given the district court's findings regarding the timeline of events, Mr. Frazier's detention was unlawful at that point unless supported by a reasonable suspicion of criminal conduct. *See* Aple. Br. at 49 n.8.

sniff was time the citation-related tasks went unaddressed. Consequently, his actions necessarily prolonged the stop.[2]

The government contends instead that the investigative delay caused by the trooper's effort to arrange the dog sniff was nevertheless permissible because he had already developed a reasonable suspicion of drug trafficking at that point. We disagree. Reasonable suspicion requires a "particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Cortez*, 965 F.3d at 834 (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)). "While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011). The government bears the burden of satisfying this standard, but it is not an onerous one. *Id.*

The district court identified several circumstances supporting its conclusion that the trooper had reasonable suspicion that Mr. Frazier was engaged in criminal activity. For reasons discussed in further detail below, we consider only those facts known to the

---

[2] We recognize that our holding is at odds with the Fourth Circuit's decision in *United States v. Hill*, in which the court declined to disturb the district court's "factual finding" that an officer's call for a canine unit "did not extend the time period of the stop." 852 F.3d 377, 384 (4th Cir. 2017). The court's reasoning on that point, however, is hard to reconcile with *Rodriguez*'s teaching that if traffic-related tasks can be completed expeditiously, then that is the amount of time reasonably required to complete the stop. *See United States v. Green*, 897 F.3d 173, 182 (3d Cir. 2018) (describing *Hill*'s holding as "far from obvious under the reasoning of *Rodriguez*"). We believe our conclusion is more consistent with the Court's instruction.

trooper at the point he diverted from his traffic-based mission to arrange the dog sniff. *See Green*, 897 F.3d at 179 ("After determining when the stop was extended . . . we can assess whether the facts available to [the officer] *at that time* were sufficient to establish reasonable suspicion that Green was involved in drug trafficking." (emphasis added)).

### 1. *The Duffle Bag*

The district court credited the trooper's testimony that the duffle bag he saw in the back of Mr. Frazier's vehicle was indicative of drug trafficking. Given the specialized training and experience that law enforcement officers have, we generally defer to their ability to distinguish between innocent and suspicious behavior, but deference becomes inappropriate "when an officer relies on a circumstance incorrigibly free of associations with criminal activity." *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005). The government does not defend the district court's reliance on this factor, and we conclude as we have in the past that the presence of a bag in a vehicle adds nothing to the reasonable suspicion calculus. *See id.* at 1124, 1133 (declining to give any weight to the presence of a new, locked suitcase in the defendant's trunk). It is merely evidence of travel.

### 2. *The Window and the Air Freshener*

The district court credited the trooper's testimony that the presence of the air freshener in the console and Mr. Frazier's failure to completely roll down his window suggested that Mr. Frazier was trying to hide odors emanating from the vehicle. In doing so, however, it appears the court failed to fully consider the trooper's testimony that he

11

never smelled any deodorizer or contraband, even though he was perched over the open window during the entire exchange. While the strong smell of air freshener may support reasonable suspicion because it may indicate an effort to disguise the smell of contraband, *see, e.g.*, *United States v. Sanchez-Valderuten*, 11 F.3d 985, 989 (10th Cir. 1993), no such inference can be drawn from the presence of an air freshener bottle that does not appear to have been in use.

We are similarly unimpressed with the fact that Mr. Frazier did not completely roll down his window. Although a refusal to open a window might support a finding of reasonable suspicion in some circumstances, *see United States v. Ludlow*, 992 F.2d 260, 261–62, 264–66 (10th Cir. 1993), we are not persuaded that it does here. Unlike in *Ludlow*, where weather was not a factor, here it was a brisk 44 degrees on the morning in question. Moreover, although the window was not completely open, it was open wide enough to carry on a conversation and hand objects back and forth without difficulty. Even before he complied with the trooper's request to open the window further, Mr. Frazier had opened the window wide enough that any inculpatory odors would have been readily detectable to an officer in Trooper Gibbs's position. Given that the trooper smelled nothing, we do not think that a reasonable officer would have viewed the partially unrolled window as an effort to conceal the smell of contraband.

The government also contends that Mr. Frazier's failure to fully roll down his window was suspicious because "it could have appeared as defiant behavior," a rationale that neither the trooper nor the district court relied upon. *See* Aple. Br. at 25 n.4 (quoting

*United States v. Ahmed*, 825 Fed. App'x 589, 592 (10th Cir. 2020)). This interpretation is at odds with all other aspects of Mr. Frazier's behavior, none of which can reasonably be described as defiant. Accordingly, we give this factor no weight.

### 3. Mr. Frazier's Response to Questioning

The district court also cited the trooper's belief that the way Mr. Frazier responded to routine questions suggested he had something to hide. The government argues that this was appropriate because we have held that "evasive answers" regarding one's travel plans may support a finding of reasonable suspicion. Aple. Br. at 31 (citing *United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010); *Sanchez-Valderuten*, 11 F.3d at 989). Again, this allegedly suspicious behavior must be viewed in context.

The first response cited by the government came after the trooper asked Mr. Frazier where he was traveling from. A moment before, the trooper had stepped away from the window, and when he returned, Mr. Frazier was on his phone trying to find the rental company's contact information to prove he had authority to operate the vehicle. Trooper Gibbs's question, therefore, came out of the blue while Mr. Frazier was busy trying to comply with a prior request. The ensuing pause lasted no longer than one would expect from anyone asked a question under such circumstances.

The second supposedly suspicious response came just a few seconds later. As Mr. Frazier was responding to the trooper's request to come back to the squad car, the trooper abruptly switched gears and asked Mr. Frazier how long he had been at his sister's house. At this, Mr. Frazier paused briefly and then asked the trooper why he was asking these

13

questions. The trooper testified that this made him suspicious because Frazier was "answering questions with other questions." Rec., vol. I at 57. This is a dubious ground for suspicion of criminal conduct. Officers may, in the name of officer safety and "to get a feel for what's going on," make limited inquiries into travel plans and the like, *see Cortez*, 965 F.3d at 839–40, but refusal to answer law enforcement questions cannot form the basis of reasonable suspicion, *Santos*, 403 F.3d at 1132 (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality); *Brown v. Texas*, 443 U.S. 47, 52–53 (1979)). Moreover, "many motorists, even innocent ones, might think it none of the trooper's business how long" they spent at their sister's house. *See id.* at 1131. If officers ask personal, seemingly irrelevant questions during traffic stops, it should be no surprise—let alone grounds for suspicion—when a motorist asks them why.

The final interaction, in which the trooper asked Mr. Frazier where in California he was coming from, is equally flawed. Once again, the trooper interjected the question as an abrupt non sequitur while Mr. Frazier was distracted by his phone. Given the manner and timing of the question, the beat taken by Mr. Frazier as he turned his attention away from the phone and back to the trooper was therefore not suspicious; it was exactly how one would expect any driver to respond under the circumstances.

Given the nature and context of Trooper Gibbs's questions, it was unreasonable for the district court to rely on his conclusion that Mr. Frazier's responses were indicative of deception. Our deference to law enforcement judgment extends to reasonable inferences

drawn from specific, articulable facts, not inchoate suspicions and unparticularized hunches. *Simpson*, 609 F.3d at 1146–47. Where we have credited a defendant's alleged "evasiveness" regarding his travel plans, the officer was able to provide some objective grounds for his belief that the defendant was trying to hide criminal conduct. For example, in *Sanchez-Valderuten*, the officer asked about the defendant's travel plans only for the defendant to go off on a tangent studded with wholly irrelevant information that was inconsistent with the route he was traveling. And the officer's suspicions were further bolstered by the "very heavy smell" of air freshener and coffee, which the officer described as masking agents commonly used by drug traffickers. *Sanchez-Valderuten*, 11 F.3d at 987. Similarly, in *Simpson*, the officer knew that the defendant had a criminal history involving drug transportation, his trembling exhibited extreme nervousness, and he gave inconsistent answers regarding the timeline of his trip. *See Simpson*, 609 F.3d at 1147–48, 1151.

Here, by contrast, Trooper Gibbs cited no meandering, inconsistent, or illogical answers. He cited only the duffle bag, the air freshener bottle, and the partially unrolled window, facts that were completely innocuous. Thus, at bottom, the trooper's suspicion was based on nothing more than his own subjective interpretation of Mr. Frazier's behavior, which was entirely consistent with that of a driver who, though distracted and mildly annoyed by an arguably invasive question, had absolutely nothing to hide. In other words, the trooper merely had a hunch. As such, his belief that Mr. Frazier's responses were indicative of criminal conduct was not entitled to the deference it received from the district court.

### 4.    *Two IDs*

Next, the district court cited the fact that Mr. Frazier had a driver's license from Iowa and an identification card from Missouri. Although the court referenced the two IDs, it did not explain how they added to reasonable suspicion. Nor is it obvious how they would. Mr. Frazier said that he spent time in both Missouri and Iowa, which are neighboring states, both IDs were valid, and both bore consistent information. Even the trooper testified that he did not think them suspicious once he saw that the Iowa card was genuine.

The government's effort to fill in the blanks is hardly convincing. Rather than tie the IDs to some particularized indicia of wrongdoing, the government merely cites the IDs as an "odd fact" that "could" have caused the trooper to suspect that something was "amiss" when considered together with his other observations. Aple. Br. at 38. This reasoning is far too flimsy to be afforded any weight. Although wholly innocent conduct may support a finding of reasonable suspicion when viewed alongside other factors, there must be a concrete reason to support that interpretation. *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997). As neither the district court nor the government has supplied one, we afford no weight to the fact that Mr. Frazier had valid identification from two different states.

### 5.  *Missing Rental Agreement*

Finally, the district court cited Mr. Frazier's inability to find his rental agreement. This might have provided reasonable suspicion under other circumstances, but it is of no

16

use to the government in this case. A driver's inability to produce a rental agreement may justify continued detention for the purpose of investigating his authority to drive the vehicle, but it cannot justify continued detention for the purpose of investigating drug trafficking. *United States v. Williams*, 271 F.3d 1262, 1269–70 (10th Cir. 2001).  Because Trooper Gibbs diverted from the stop's initial mission to arrange for a dog sniff rather than to establish Mr. Frazier's authority to drive the vehicle, Mr. Frazier's inability to lay hands on the agreement can play no role in our reasonable suspicion analysis.

### 6.  Rental Car and Cross-Country Travel

The government also asks us to consider the fact that Mr. Frazier was driving a rental car and traveling cross country, although these were not among the factors expressly relied upon by the district court. Neither is compelling.

Generally, the fact that a vehicle has been rented, standing alone, does not add to reasonable suspicion unless there are specific facts that make the rental relevant or unusual. *Compare United States v. Berg*, 956 F.3d 1213, 1219–20 (10th Cir. 2020) (declining to give weight to vehicle's rental status because use of a rental vehicle was not inconsistent with the defendant's travel plans and the officer did not identify anything unusual about the rental in question), *with Williams*, 271 F.3d at 1270 (giving weight to vehicle's rental status in part because it was rented in a city known to be a staging area for drug distribution and because defendant attempted to conceal that fact from law enforcement).

17

The government leans heavily on *United States v. Davis*, 636 F.3d 1281 (10th Cir. 2011), to support its assertion that a vehicle's rental status may itself be suspicious, but other facts made the rental particularly noteworthy in that case. Specifically, like the defendant in *Williams*, 271 F.3d 1262, the defendant in *Davis* attempted to hide where he and his companions had rented the vehicle. *See Davis*, 636 F.3d at 1288–89, 1292. Moreover, the defendant "appeared agitated and nervous" when asked about the location of the car rental. *Id.* at 1291. Here, by contrast, the government points to nothing in the record other than the fact of the rental itself. Accordingly, the fact that the vehicle was rented adds little.

Mr. Frazier's travel plans, meanwhile, add nothing at all. Although we have held that "[i]mplausible travel plans can contribute to reasonable suspicion," *see Simpson*, 609 F.3d at 1149 (citing *Santos*, 403 F.3d at 1129), the government points to nothing about Mr. Frazier's itinerary as it was known to Trooper Gibbs at this point in the stop to suggest that his travel plans were implausible or in any way inconsistent. Accordingly, absent other facts suggestive of criminal wrongdoing, we give no weight to the fact that Mr. Frazier was returning from a trip to the West Coast.

### 7. *Totality of the Circumstances*

Even when viewed in the aggregate, the factors discussed above are insufficient to establish reasonable suspicion. Stripped of those facts that must be disregarded as completely innocuous, we are left with the trooper's hunch that Mr. Frazier was trying to hide something and the fact that he was driving a rental car. Reasonable suspicion is a

low bar, but it is not that low. Consequently, because the trooper lacked reasonable suspicion to extend the stop by several minutes to arrange for the dog sniff, Mr. Frazier's seizure violated the Fourth Amendment.

**B.**

The government contends that our conclusion regarding the delay caused by Trooper Gibbs's arrangement of the dog sniff does not end our inquiry because he developed reasonable suspicion a few minutes later when he conducted the DEASIL search and discovered the brevity of Mr. Frazier's stay in California.[3] The government asserts that the information gleaned from the search "can be used in the reasonable suspicion analysis" because the trooper conducted the query while waiting for dispatch to return the records he had requested. Aple. Br. at 40. Since that information was obtained during a period in which "Frazier would have been stopped anyway," the government claims that it could not have added time to the stop and therefore did not violate *Rodriguez*.

This argument is unavailing for two reasons. First, even if we were to assume that the DEASIL search did not itself violate *Rodriguez*, the government does not explain how

---

[3] Alternatively, the government asserted for the first time at oral argument that even if Trooper Gibbs violated *Rodriguez* when he arranged the dog sniff, the exclusionary rule does not apply because the DEASIL search provided an "independent source" for the contested evidence. Not only is this argument too late, *see United States v. Woodard*, 5 F.4th 1148, 1160 (10th Cir. 2021), it is foreclosed by the government's failure to show that the DEASIL search did not itself extend the traffic stop in violation of *Rodriguez*, *see* discussion *infra* Section II.B.2.

19

the information the trooper obtained could have any bearing on our reasonable suspicion analysis as it regards an earlier investigative detour. Second, the government has not carried its burden to show that the DEASIL search did not itself extend the traffic stop in violation of *Rodriguez*.

*1.*

Even if, as the government claims, the DEASIL search did not further extend the stop, it would not alter our decision because that search followed an earlier *Rodriguez* violation. In *United States v. Green*, the Third Circuit confronted a similar sequence of events. There, the officer pulled over the defendant for a traffic violation and engaged in a brief roadside conversation with him. 897 F.3d at 176–77. Upon returning to his cruiser, the officer immediately telephoned a colleague to share his suspicions regarding the driver. Eight minutes later, the officer returned to the defendant's vehicle to issue a warning citation and the two engaged in additional conversation that arguably would have added to the officer's suspicion. *Id.* at 177. As the defendant turned to walk back to his vehicle, the officer asked for his permission to search the car. *Id.* When the defendant declined, the officer instructed him to wait in his vehicle until further notice. About fifteen minutes later, a canine unit arrived and alerted on the defendant's vehicle. A subsequent search turned up twenty pounds of heroin in the man's trunk. *Id.* On appeal, the man challenged the search on the grounds that the officer had impermissibly extended the stop to facilitate the dog sniff.

After discussing *Rodriguez* and the various ways other courts had interpreted it, the Third Circuit proceeded by looking for the "*Rodriguez* moment," i.e., the moment when the officer extended the stop by engaging in non-traffic inquiries. *See id.* at 179–83. Clearly, the court concluded, the officer extended the traffic stop when, after issuing a warning citation, he instructed the defendant to wait in his vehicle. "The key question," was whether the "*Rodriguez* moment" occurred earlier, when the officer called his colleague rather than work on the citation. *Id.* at 81. If it did, "then nothing later in the stop [could] inform [the court's] reasonable suspicion analysis," including the conversation that occurred when the officer issued the citation. *Id.* at 181–82.[4]

We think *Rodriguez* leads to the same conclusion in this case. Having determined that the trooper extended the stop when he arranged for the dog sniff, the question before us is whether the facts known to him at that moment established reasonable suspicion. Facts learned later in the investigation are irrelevant. Moreover, like the Third Circuit, we read *Rodriguez* as holding that when reasonable suspicion is lacking at the "*Rodriguez* moment," seizure of the individual remains illegal from that point forward. *See Rodriguez*, 575 U.S. at 355 ("The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009))). Consequently, even if the DEASIL search itself did

---

[4] Ultimately, the Third Circuit concluded that, unlike Trooper Gibbs, the officer *did* have reasonable suspicion when he prolonged the traffic stop at the time of his investigative detour. As a result, the court had "no need to address the possible implications of a later '*Rodriguez* moment.'" *Green*, 897 F.3d at 182.

not add time to the stop, it would not matter because the initial illegal seizure was ongoing.

Our decision in *United States v. Gurule*, 935 F.3d 878 (10th Cir. 2019), on which the government relies, is not to the contrary. In that case, we held that the officer did not violate *Rodriguez* because it was his conduct with respect to his traffic-based mission that prolonged the stop, not his investigative actions. There, however, the traffic-based delay had not followed an earlier *Rodriguez* violation, as happened here. Thus, *Gurule* provides no support for the government's proposition that, when an officer undertakes an unjustified investigative detour, there is no Fourth Amendment violation if he can supply the missing reasonable suspicion by way of further investigation that does not itself prolong the traffic stop.

*2.*

We decline to consider the information gleaned from the DEASIL search for the additional reason that the government has failed to show that search was not itself an investigative detour that added time to the traffic stop. The government's argument, that the search did not violate *Rodriguez* because it neither exceeded the scope of the stop's traffic-based mission nor extended its duration, does not withstand scrutiny on either point.

To start with, the DEASIL search plainly exceeded the scope of the stop's traffic-based mission. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 575 U.S. at 355

(alteration in original) (quoting *Caballes*, 543 U.S. at 408). This includes activities with a "close connection to roadway safety," such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 355, 356. Searching a Drug Enforcement Administration database to establish when and where a person traveled days earlier is plainly not such an inquiry. *See* Rec., vol. I at 80 (Trooper Gibbs testifying that he consults the database when he is "suspicious of criminal activity"). Because a DEASIL search is aimed at detecting evidence of ordinary wrongdoing rather than ensuring the safe operation of vehicles on the road, *see Rodriguez*, 575 U.S. at 355–56, the trooper clearly diverted from his traffic-based mission when he ceased working on the citation to consult the database.

The government has also failed to show that this diversion did not prolong the stop. It is not enough that the search occurred before dispatch returned the records. Under *Rodriguez*, it makes no difference whether an investigative detour occurs before or after the completion of the stop's traffic-based mission. The question is whether the stop would have ended sooner had the officer continued to work diligently on the traffic-related tasks rather than pursue an unrelated investigation. *See id.* at 357 ("If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" (alteration in original) (quoting *Caballes*, 543 U.S. at 407)). Thus, the government must show not only that the search occurred during a period when Mr. Frazier would have been seized anyway, it must also

23

show that that the stop would not have ended sooner had the trooper forgone the search and instead continued to work diligently on traffic-related tasks. It has failed to do so.

The trooper requested the records at 9:18 a.m. and dispatch returned the results at 9:27 a.m. They only way to show that the DEASIL search did not "add time" to the stop for *Rodriguez* purposes would be to show that, had the trooper continued to work diligently on his remaining traffic-related tasks, he not only would have completed them within that nine-minute interval, he would have done so with sufficient time to also complete the DEASIL search, which itself took two minutes. The government has pointed to no such evidence; therefore, it has not carried its burden to show that the trooper executed the DEASIL search in a manner that complied with the Fourth Amendment.

### III
### Conclusion

Trooper Gibbs departed from the traffic-based mission of the stop by arranging the dog sniff, an investigative detour that was unsupported by reasonable suspicion and that added time to the stop in violation of *Rodriguez*. Mr. Frazier's seizure was thereafter in violation of the Fourth Amendment. The trooper's consultation of the DEA database, a second investigative detour, only aggravated that ongoing violation. Accordingly, the evidence discovered because of that seizure is tainted by its unlawfulness and is inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).

We REVERSE the district court's denial of Mr. Frazier's motion to suppress.