**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 10, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ADONIS BATISTA, a/k/a A-1,

    Defendant - Appellant.

No. 23-6204
(D.C. No. 5:22-CR-00374-PRW-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **ROSSMAN**, **KELLY**, and **MURPHY**, Circuit Judges.
_____

Following a three-day jury trial, Defendant-Appellant, Adonis Batista, was convicted of conspiracy to distribute and to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. 21 U.S.C. § 841(a)(1). He was sentenced to the statutory cap of 240 months' imprisonment followed by three years' supervised release. On appeal, Mr. Batista contends that the district court erred (1) in sentencing him based upon a higher quantity of drugs than the jury found, and (2) by denying his motion to

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

suppress given an unconstitutionally extended traffic stop.  Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## Background

On July 16, 2022, the Oklahoma City Drug Enforcement Administration ("DEA") investigated a drug-related house fire in Del City, Oklahoma.  II R. 39.  The residence turned out to be a methamphetamine conversion lab.  Id.  DEA agents seized approximately 750 grams of methamphetamine and 35 gallons of liquid methamphetamine.  Id. at 40.  Several documents in the house identified Mr. Batista, including his medical marijuana card, credit cards and a T-Mobile receipt with his name, and a passport card with his photograph.  I R. 188–90, 193–94; III R. 68–69.  Agents also found a Wal-Mart receipt, which was used to gain access to Wal-Mart surveillance footage showing Mr. Batista shopping with his co-defendants.  III R. 73–74.  On July 25, 2022, DEA agent Jeremy Epp observed Mr. Batista in a Wal-Mart parking lot with his co-defendants, exchanging what Agent Epp mistakenly believed to be drugs.  Id. at 113.  Agent Epp instructed the Oklahoma Highway Patrol ("OHP") to make a traffic stop.  Id. at 75–76.  OHP Trooper, Zane Shores, stopped Mr. Batista while traveling on I-35 South.  I R. 39.

During the stop, Trooper Shores smelled marijuana and discovered that Mr. Batista was driving without a valid license.  Id. at 40.  Mr. Batista twice consented to a search of his vehicle which yielded a small amount of marijuana and identification cards with Mr. Batista's photo, but different names.  Id. at 40–41.  Trooper Shores

2

issued a warning to Mr. Batista and stated that DEA Agents Epp and Sean Lively were going to question him. Id. at 153–55. During a post-Miranda interview, Mr. Batista told the agents that he was paid to drive a co-defendant from Florida to Oklahoma, and that he stayed in the Del City conversion lab for only one night. Id. at 156. He denied knowing why his personal documents were in the conversion lab but made several statements regarding his involvement with his co-defendants from July 16, 2022 through July 25, 2022. Id. at 156–58. Mr. Batista also provided Agents Epp and Lively the names, phone numbers, and social media accounts of his co-defendants. Id. Finally, Mr. Batista explained to Agents Epp and Lively that he had called the Oklahoma Bureau of Narcotics earlier that day to report the methamphetamine drug operation. Id. at 159.

When Agent Epp asked for Mr. Batista's consent to search his two phones, Mr. Batista refused. Id. at 77. Agent Epp seized Mr. Batista's cell phones and allowed him to leave. Id. at 77–78. Pursuant to a state search warrant, Agent Epp searched Mr. Batista's cell phones and discovered several messages, photos, and videos implicating him in the methamphetamine drug operation. Id. at 99–104; III R. 136–72. A search of Mr. Batista's historic cell phone data (obtained pursuant to a later-issued federal search warrant) also placed Mr. Batista at the conversion lab on hundreds of occasions from the time that he arrived in Oklahoma. I R. 105–17; III R. 477–81.

Mr. Batista's indictment alleged that he and his co-defendants were responsible for 500 grams or more of methamphetamine. I R. 12–14. Pursuant to

special interrogatory, however, the jury found him responsible for less than 50 grams. Id. at 281–83. This smaller amount would have limited Mr. Batista's exposure to 20 years' imprisonment. Id. at 285. Nevertheless, the presentence report ("PSR") recommended holding Mr. Batista responsible for 267,874.866 kilograms of converted drug weight[1] for sentencing purposes. II R. 46. This resulted in a base offense level of 38. Id. at 47. Mr. Batista objected on the grounds that the jury's answer to the special interrogatory showed that he "was acquitted of being involved in a conspiracy involving fifty to five-hundred grams of methamphetamine" and that the district court was limited to the jury's "specific finding of fact that [he] was accountable for less than 50 grams of methamphetamine." Id. at 114–15. According to him, the base offense level should have been 22. Id. at 115.

The district court overruled Mr. Batista's objection. III R. 692. Finding by a preponderance of the evidence that Mr. Batista was responsible for more than 50 grams of methamphetamine, the court adopted the PSR's recommendation. Id. at 688. The court noted that Mr. Batista obtained a benefit of the jury's quantity finding which limited his exposure to 20 years. Id. at 692, 730.

---

[1] This figure included 693 grams of "Ice" and 35 gallons of liquid methamphetamine. II R. 46.

4

**Discussion**

## I. The District Court Did Not Err by Holding Mr. Batista Responsible for More Than 500 Grams of Methamphetamine for Sentencing Purposes.

On appeal, Mr. Batista argues that the court committed a procedural error by setting his base offense level at 38 because, according to him, the district court was bound by the jury's "affirmative finding" that he was responsible for less than 50 grams of methamphetamine. Aplt. Br. at 27–28. We review sentences imposed by a district court for an abuse of discretion. United States v. White, 782 F.3d 1118, 1128 (10th Cir. 2015). An abuse of discretion occurs if a sentence is "arbitrary, capricious, whimsical, or manifestly unreasonable." Id. at 1129 (quotations omitted). Sentences are reviewed for both procedural and substantive reasonableness. Id. Procedural errors include "'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence[.]'" Id. (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).

Arguing that the district court procedurally erred at his sentencing, Mr. Batista urges us to follow United States v. Pimentel-Lopez, where a Ninth Circuit panel held that when the jury makes an "affirmative finding[] under the highest standard of proof known to our law," the district court "cannot attribute more than that amount to defendant without contradicting the jury on a fact it found as a result of its deliberations." 859 F.3d 1134, 1140 (9th Cir. 2016). According to Mr. Batista, the jury's special interrogatory holding him responsible for less than 50 grams of

methamphetamine was an affirmative finding which the district court was not at liberty to ignore. Aplt. Br. at 28. We are not persuaded.

Tenth Circuit precedent is clear that "[a] jury verdict of acquittal on related conduct [] 'does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'" United States v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005) (quoting United States v. Watts, 519 U.S. 148, 157 (1997)). In Magallanez, the jury attributed 50-500 grams of methamphetamine to the defendant on a special interrogatory identical to Mr. Batista's in all relevant respects. Id. at 682. Yet the district court held him responsible for 1.21 kilograms under a preponderance standard for sentencing purposes. Id. In affirming that sentence, this court was unequivocal: "when a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard." Id. at 685. We have followed Magallanez. United States v. Keck, 643 F.3d 789, 798 (10th Cir. 2011); United States v. Gunn, No. 21-6168, 2023 WL 2808109, at *16 (10th Cir. Apr. 6, 2023).[2]

We recognize that the Ninth Circuit panel opined that cases like Magallanez did not directly address the argument that "the affirmative finding by the jury . . . precluded a contradictory finding by the district judge during sentencing." Pimentel-

---

[2] Although not precedential, we find the reasoning of this case to be instructive. See 10th Cir. R. 32.1; Fed. R. App. P. 32.1.

Lopez, 859 F.3d at 1141.  We are not persuaded by this distinction.  See id. at 1137 (Graber, J., dissenting from the denial of reh'g en banc) ("A verdict form such as the one in this case is best understood to mean that the government proved its case only with respect to some amount of drugs weighing less than 50 grams.").

Here, the district court stated that all of the evidence in the case suggested that the methamphetamine drug operation involved "huge quantities."  III R. 688.  This supported its finding by a preponderance of the evidence that Mr. Batista was responsible for more than 50 grams of methamphetamine for sentencing purposes.  Id. at 691–92.  Indeed, the court went so far as to indicate that the evidence implicating Mr. Batista in a drug conspiracy involving more than 50 grams of methamphetamine would even satisfy the higher evidentiary standard of clear and convincing evidence.  Id.  Because the district court's procedure comports with Tenth Circuit precedent, we cannot say that the sentence imposed in this case constitutes an abuse of discretion.  See Magallanez, 408 F.3d at 685.

**II. The District Court Did Not Err by Denying Mr. Batista's Motion to Suppress.**

Next, Mr. Batista argues that the district court erred by denying his motion to suppress because, according to him, the traffic stop was illegally extended, and no probable cause supported the search of his cell phones.  Aplt. Br. at 28.  On review of a denial of a motion to suppress, we review factual findings for clear error, viewing the evidence in the light most favorable to the prevailing party.  United States v. Venezia, 995 F.3d 1170, 1175 (10th Cir. 2021).  A factual finding is clearly

erroneous "if it is without factual support in the record or if the appellate court, after reviewing all of the evidence, is left with a definite and firm conviction that a mistake has been made." United States v. Craine, 995 F.3d 1139, 1157 (10th Cir. 2021). On the other hand, the determination of whether a search and seizure were reasonable under the Fourth Amendment is reviewed de novo. Venezia, 995 F.3d at 1175.

Mr. Batista first argues that the traffic stop was illegally extended to permit questioning by the Agents Epp and Lively. Aplt. Br. at 29–30. Because a traffic stop is a seizure within the meaning of the Fourth Amendment, it must be "justified at its inception and the officer's actions must be reasonably related in scope to the mission of the stop." United States v. Frazier, 30 F.4th 1165, 1172–73 (10th Cir. 2022) (quotations omitted). To extend a stop, an officer must have reasonable suspicion. Id. (citing Rodriguez v. United States, 575 U.S. 348, 355 (2015)). Reasonable suspicion exists where the totality of the circumstances gives rise to "specific and articulable facts and rational inferences" that "a person has or is committing a crime." United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir. 2009). Under the collective knowledge doctrine, "the reasonable suspicion or probable cause of one officer can be imputed to the acting officer." United States v. Pickel, 863 F.3d 1240, 1249 (10th Cir. 2017). The exclusionary rule bars admission of evidence derived "directly or indirectly through the exploitation of unconstitutional police conduct." United States v. Hatfield, 333 F.3d 1189, 1193–94 (10th Cir. 2003).

Here, the traffic stop was justified at its inception because officers observed Mr. Batista exceeding the speed limit. Aplee. Br. at 4; United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011) ("A traffic stop is justified at its inception if . . . a traffic violation has occurred[.]" (quotations omitted)). Regarding the scope and duration of the traffic stop, the evidence demonstrates that the officers had reasonable suspicion to extend the stop beyond the purpose of issuing a warning. See Rodriguez, 575 U.S. at 350–51. Before the stop, Agent Epp knew that (1) documents identifying Mr. Batista were found in the methamphetamine conversion lab, (2) Mr. Batista was seen shopping at Wal-Mart with his co-defendants, (3) Mr. Batista participated in what appeared to be a drug transaction in the Wal-Mart parking lot, and (4) Mr. Batista had an extensive criminal history which included a drug-related felony conviction. Aplee. Supp. R. 50–66. Under the collective knowledge doctrine, Agent Epp's knowledge can be imputed to Trooper Shores, thereby satisfying the reasonable suspicion standard to extend the stop. See Pickel, 863 F.3d at 1249. What's more, Trooper Shores also (1) smelled marijuana in Mr. Batista's car, (2) realized Mr. Batista was driving from Oklahoma to Florida without a valid driver's license, (3) discovered that Mr. Batista had marijuana in the car, and (4) saw that Mr. Batista had two phones on his person despite having no legitimate employment. See generally, Ex. 8, Trooper Shores Body Camera. The totality of the circumstances thus supports the existence of reasonable suspicion to justify the extension of the traffic stop. See Rodriguez, 575 U.S. at 354–55.

9

Mr. Batista next argues that the Agent Epp's warrantless seizure of his two cell phones was not supported by probable cause or an exception to the warrant requirement. Aplt. Br. at 35–36. But, in Andersen v. DelCore, we held that warrantless seizure of a cell phone is permissible "to prevent the deletion of incriminating evidence that the officer had probable cause to believe existed on the cell phone." 79 F.4th 1153, 1166 (10th Cir. 2023) (citing United States v. Place, 462 U.S. 696 (1983)). Probable cause "depends on the totality of the circumstances" and looks to whether the facts, "viewed from the standpoint of an objectively reasonable officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003).

Here, the totality of the circumstances rendered it objectively reasonable for an officer in Agent Epp's position to believe that Mr. Batista's cell phones contained incriminating evidence, thereby justifying the warrantless seizure. Andersen, 79 F.4th at 1166. As explained, Agent Epp knew of several facts implicating Mr. Batista in the methamphetamine drug operation. During the post-Miranda interview, Mr. Batista had both of his phones and referenced information that could reasonably be expected to be found on those phones such as the phone numbers and social media accounts of his co-defendants, the phone call he placed to the Oklahoma Bureau of Narcotics, and an electronic payment he received from his girlfriend. Aplee. Supp. R. 72–73, 75, 76–77. Agent Epp also noticed that Mr. Batista had two cell phones despite not having any legitimate employment. I R. 85. Agent Epp even testified that he believed that he had probable cause to arrest Mr. Batista, but that he let Mr. Batista go to avoid thwarting investigative efforts of the co-defendants. Aplee. Supp.

10

R. 77.  And we have recognized that cell phones are "recognized tool[s]" of the drug trade.  United States v. Slater, 971 F.2d 626, 637 (10th Cir. 1992).  We are therefore persuaded that the warrantless seizure was permissible "to prevent the deletion of incriminating evidence that the officer had probable cause to believe existed on the cell phone."  Andersen, 79 F.4th at 1166.

Finally, Mr. Batista argues that the state and federal search warrants were not supported by probable cause.  Aplt. Br. at 36.  A warrant is supported by probable cause if "the magistrate makes a 'practical, common-sense decision' that, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Edwards, 813 F.3d 953, 960 (10th Cir. 2015) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Here, the applications for the state and federal search warrants set forth all facts known to the DEA agents from the day of the house fire through the traffic stop and the post-Miranda interview.  I R. 101–02, 108–12. The facts set forth were not, as Mr. Batista contends, "mere speculation."  Aplt. Br. at 36.  Rather, they were specific and concrete facts which detailed the entire span of the investigation process and support the requisite "fair probability" that a search of the phone would return evidence of the drug trafficking operation.  Edwards, 813 F.3d at 960.  Both warrants were supported by abundant probable cause.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge