**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 21, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHARLES OWENS PARKER, JR.,

    Defendant - Appellant.

No. 21-7035
(D.C. No. 6:19-CR-00095-RAW-1)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT[*]**
_____

Before **TYMKOVICH**, Chief Judge, **HOLMES** and **ROSSMAN**, Circuit Judges.
_____

Charles Owens Parker, Jr., appeals the district court's denial of his motion to

suppress evidence obtained during a traffic stop.  Exercising jurisdiction under

28 U.S.C. § 1291, we affirm.

I.

In 2019, Mr. Parker was charged with being a felon in possession of a firearm

and ammunition in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2).  He filed a

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

motion to suppress the evidence obtained during a traffic stop under the theory that two firearms recovered from the vehicle should have been suppressed as the fruits of an unconstitutional stop under the Fourth Amendment. Following a hearing, the magistrate judge issued findings and a recommendation to deny Mr. Parker's motion. The district court overruled Mr. Parker's objections and adopted the judge's findings and recommendation. Mr. Parker then entered into a conditional plea agreement that preserved his right to appeal the denial of his motion to suppress. He was sentenced to 70 months' imprisonment. Exercising his reserved right, Mr. Parker now appeals.

## II.

At the suppression hearing, Okmulgee County Sheriff Deputy Elijah Presley testified that at approximately 3:30 a.m. on August 29, 2019, he was driving alone in his patrol car when he observed a GMC Yukon pulling a trailer. He observed that the taillight on the right side of the trailer was not functioning and decided to investigate. To that end, he activated his emergency lights and followed the vehicle when it pulled off the road and into a hotel parking lot.

Based on his experience and training, which included more than 5,000 traffic stops, 500 of which involved defective taillights, Deputy Presley decided to first approach the passenger side of the vehicle. The passenger, who was later identified as Mr. Parker's fiancée, Patricia McGraw, had the window rolled down. As soon as Deputy Presley reached the open window, he saw the handle of a firearm wrapped in black tape and tucked between the driver's seat and the center console. Although Deputy Presley admitted that it was dark outside and the interior lights in the vehicle

2

were not on, he testified that he could make out what appeared to be a chopped down stock, which had a circular nub or handle. He told the occupants to keep their hands where he could see them and crossed in front of the vehicle to the driver's door.

As soon as Deputy Presley reached the driver's door, he told the driver, who was later identified as Mr. Parker, to step out of the vehicle. As he was exiting the vehicle, Mr. Parker "started pleading with [Deputy Presley], 'Come on, man. Please don't do this to me, please.'" R., Vol. 1 at 78. Curious as why Mr. Parker was so upset, Deputy Presley asked if he was worried about the firearm because he was "a convicted felon[,]" and Mr. Parker admitted "that he was, in fact, a convicted felon." Id. at 79. Deputy Presley then handcuffed Mr. Parker, removed the firearm, and walked Mr. Parker to his patrol car.

Deputy Presley gave Mr. Parker a Miranda warning[1] and he indicated that he understood his rights and was willing to talk. Deputy Presley asked if there were any other weapons in the vehicle and Mr. Parker said there was a shotgun in the back seat. In the meantime, Deputy Presley verified Mr. Parker's criminal record through dispatch and further learned that the vehicle was owned by Ms. McGraw. Deputy Presley returned to the vehicle, obtained Ms. McGraw's consent for a search, and found the shotgun in the back seat. Once he confirmed that Ms. McGraw had a valid driver's license, Deputy Presley allowed her to leave with the vehicle and trailer.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Shonterra Terri Thomas, Mr. Parker's cousin, also testified at the suppression hearing. She told the magistrate judge that the day before the traffic stop, she followed Mr. Parker, who was driving the Yukon with the trailer attached, home from a store where she had purchased some construction supplies. According to Ms. Thomas, the trailer's taillights were in working order. Ms. Thomas admitted that she loved her cousin and would do anything for him.

Ms. McGraw also testified at the hearing. She explained that at the time of the incident, she and Mr. Parker were moving from Boley, Oklahoma to Okmulgee, Oklahoma, and had loaded a "recliner[,] . . . bed, air conditioner, rugs . . . [and] all kinds of stuff on [the trailer]." *Id.* at 111. Ms. McGraw said that she needed to use the restroom and that is why they pulled into the hotel parking lot—not because Deputy Presley had activated his emergency lights. According to Ms. McGraw, Deputy Presley approached the passenger side of the vehicle and asked for her driver's license and registration. He took the documents to his patrol car and came back to the vehicle—this time to the driver's side—and asked Mr. Parker to step out of the truck. Ms. McGraw could not hear what was said other than Deputy Presley telling Mr. Parker that he was handcuffing him for safety reasons. Then, according to Ms. McGraw, Deputy Presley "leaned over into the vehicle on the driver's side, and that's when he saw the gun." *Id.* at 105. "[T]he gun was on the [floor] behind the driver's seat[] covered. The only thing that was showing was a little bit of a barrel." *Id.* "After [Deputy Presley] found the two guns, he took Mr. Parker back to his [patrol] vehicle. Then . . . he came around to my side again [and] . . . asked me to

4

get out." *Id.* She confirmed that she owned the vehicle and admitted that she consented to a search. Once the search was completed and the shotgun had been removed, Deputy Presley let her leave with the vehicle and trailer.

Ms. McGraw, who had "never pulled anything behind a car before," was nervous and went in the wrong direction when she pulled out of the parking lot. *Id.* at 106. When she realized her mistake, she "put the brakes on" "to turn around," and in doing so, "looked behind [her] because there was a car behind [her], and . . . saw [the] lights on [the trailer] and [knew the] lights were working because the car stopped for [her.]" *Id.* at 107.

### III.

The magistrate judge found credible Deputy Presley's testimony that he observed a defective taillight and therefore had a reasonable suspicion that the driver violated Oklahoma's traffic regulations, which require all vehicles, including trailers, to be operated in a safe condition. In particular, the judge found:

> This Court has considered the credibility of Deputy Presley and Ms. Thomas and Ms. McGraw and their relative motivations and circumstances and finds the officer's version of the facts to be accurate. Ms. Thomas is a direct relative of [Mr. Parker] who she loves and supports, which would understandably shade her testimony in [Mr. Parker's] favor. Moreover, she testified of conditions which existed the day before the traffic stop, which creates a break in time between her observation and the observations of Deputy Presley. Similarly, Ms. McGraw testified that [Mr. Parker] is her fiancée—again creating a motivation for [sh]ading the truth in favor of [Mr. Parker]. Additionally, Ms. McGraw's position of observation was necessarily compromised by the position and content[s] of the trailer. Deputy Presley was in a significantly better position to evaluate the condition of the equipment on the trailer.

5

*Id.* at 36.  Thus, the judge concluded that "[t]he evidence stemming from the stop should not be suppressed on the basis of a lack of a reasonable articulable belief that a violation occurred."  *Id.* at 36-37.  The judge further found that the seizure of the firearms was warranted under the plain-view and consent doctrines.  Because there were no Fourth Amendment violations, the judge recommended that Mr. Parker's motion to suppress be denied.  Mr. Parker then filed objections directed at the judge's factual findings.

## IV.

The district court reviewed the hearing transcript and agreed with the judge's credibility determination.  It further denied Mr. Parker's request for a de novo evidentiary hearing.  The court acknowledged that it was required to review Mr. Parker's objections de novo, which means "considering the actual testimony, and not merely . . . reviewing the magistrate's report and recommendation," *id.* at 121 (internal quotation marks omitted), but ruled that "[a]n additional hearing is not . . . required," *id.* at 120.  *See United States v. Raddatz*, 447 U.S. 667, 674-75 (1980) (noting the district court is required to make a de novo determination—not to conduct a de novo hearing).  The court overruled the objections and adopted the judge's findings and recommendation to deny Mr. Parker's motion to suppress.

## V.

"[T]his court must review de novo the reasonableness of the government's action under the Fourth Amendment."  *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011) (internal quotation marks omitted).  However, "[i]n assessing a

denial of a motion to suppress, this court accepts the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous. Moreover, this court must view the evidence presented at the suppression hearing in the light most favorable to the Government." *Id.* at 1215-16 (citation and internal quotation marks omitted).  "Judging the credibility of the witnesses, determining the weight to be given to evidence, and drawing reasonable inferences and conclusions from the evidence are within the province of the district court." *Id.* at 1216 (internal quotation marks omitted).

"A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *United States v. Pulliam*, 748 F.3d 967, 970 (10th Cir. 2014) (internal quotation marks omitted).  This means that "[w]e must uphold any district court finding that is permissible in light of the evidence." *Id.* (internal quotation marks omitted).

## VI.

Mr. Parker does not quarrel with the legal standards applied by the district court in analyzing the validity of the traffic stop and seizure of the firearms; instead, he challenges the district court's factual determinations.  In particular, Mr. Parker raises questions surrounding (1) whether he was actually stopped by Deputy Presley or whether he pulled into the hotel parking lot to find a restroom for Ms. McGraw; (2) whether the taillight was in working order based on the conflicting testimony from Ms. Thomas and Ms. McGraw; and (3) whether Deputy Presley's testimony that

the taillight was not functioning was credible in view of the fact that he allowed

Ms. McGraw to drive away pulling a trailer that was in an unsafe condition.  He also

argues that the "butt of a gun wrapped in black electrical tape" and "tucked between

the driver's seat and the center console," could not be lawfully seized because the

incriminating character of the weapon was not immediately apparent as Deputy

Parker did not know that Mr. Parker was a convicted felon.  Aplt. Opening Br. at

13-14.  Last, Mr. Parker suggests, although the argument is difficult to follow and not

developed in any way, that Deputy Presley did not ask for permission to search Ms.

McGraw's vehicle until after he found the shotgun, which invalidated her consent

because it was not "free and voluntary" or "obtained during an illegal detention."  *Id.*

at 15.  These arguments are unavailing.

"A traffic stop is justified at its inception if an officer has . . . a reasonable

articulable suspicion that a particular motorist has violated any of the traffic or

equipment regulations of the jurisdiction."  *United States v. Winder*, 557 F.3d 1129,

1134 (10th Cir. 2009).  The legal test for a traffic stop is an objective one.  *See id.*

The evidence supports the magistrate judge's finding that Deputy Presley observed a

defective taillight on the trailer being pulled by the Yukon, which in turn led to an

objectively reasonable and articulable suspicion that the driver of the vehicle had

violated Oklahoma's traffic laws.

As the government argues, and we agree, "[w]hether the occupants of the

Yukon were aware they were being pulled over at the time they stopped in the [hotel]

parking lot is irrelevant to whether the officer was justified in conducting what he

8

thought was a traffic stop." Aplee. Br. at 14. Moreover, even if Mr. Parker is correct that Deputy Presley first observed the trailer in the hotel parking lot, he was justified in making contact with the occupants of the vehicle. *See United States v. Tafuna*, 5 F.4th 1197, 1202 (10th Cir. 2021) ("[A] consensual encounter [did not] morph into a detention when [a law enforcement officer] exited his vehicle, approached the parked car on foot, and asked the car's occupants for their names and birth dates. Officers—without any basis for suspecting criminal activity is afoot—may approach an individual, ask a few questions, and ask to examine the individual's identification." (brackets and internal quotation marks omitted)). And the finding that Deputy Presley's "version of the facts [is] accurate," R., Vol. 1 at 36, is not clearly erroneous and must be affirmed on appeal.

There is also no merit to Mr. Parker's argument that the firearm was not lawfully seized under the plain-view doctrine.

> Under the plain view doctrine, police officers may properly seize evidence of a crime if (1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe that it was contraband or evidence of a crime), and (3) the officer had a lawful right of access to the object.

*United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004).

Here, Mr. Parker maintains that the incriminating character of the firearm did not become immediately apparent until *after* the item was seized. We disagree. The magistrate judge found that "[w]hen Deputy Presley . . . approached the driver's side of the vehicle, [Mr. Parker] stated that he was a convicted felon, such that the officer

9

had a suspicion that the weapon represented contraband.  He then had the right to access the weapon for the safety of himself and the others present."  R., Vol. 1 at 37-38.  This factual finding is supported by the record and cannot be disturbed on appeal.

Last, the magistrate judge's findings concerning consent are also supported by the record and cannot be disturbed.  *See United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) ("Because voluntariness is a question of fact, the court must accept the district court's finding unless it is clearly erroneous.").  Here, the judge found that (1) Deputy Presley did not search the vehicle and recover the shotgun until *after* Ms. McGraw gave consent and (2) her consent was "unconditional [and] unequivocal."  R., Vol. 1 at 38.  Moreover, at the time she gave her consent, Ms. McGraw was not detained, much less illegally detained.

VII.

We affirm the district court's order denying Mr. Parker's motion to suppress.

Entered for the Court


Jerome A. Holmes
Circuit Judge

10